UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
SHARON WELLS,

                                 Plaintiff

-against-

THE ACHIEVEMENT NETWORK,
TEIMOSA MARTIN,
MELINDA SPOONER, and
KIMBERLY COCKRELL                            **COMPLAINT**

                          Defendants        **JURY TRIAL DEMANDED**
------------------------------------------------------X

        Plaintiff Sharon Wells ("Plaintiff"), by and through her attorneys, The Law Offices of Damon McDougal, LLC, complaining of Defendants, The Achievement Network ("Defendant ANet"), Teimosa Martin ("Defendant Martin"), Kimberly Cockrell ("Defendant Cockrell"), and Melinda Spooner ("Defendant Spooner") alleges:

## <u>INTRODUCTION</u>

        1.      Plaintiff brings this action against Defendants because of the Defendants' disability discrimination in failing to reasonably accommodate her disability pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.*, ("ADA"), Defendants' retaliation under the ADA, Defendants' unlawful interference with her exercise of her rights under The Family Medical Leave Act, 29 U.S.C. 29 U.S.C. § 2601 *et. seq*, (the "FMLA"), and discrimination against her for exercising said rights due to her perceived and actual disability in violation of the FMLA, the New York State Human Rights Law, N.Y. Exec Law. § 290 *et. seq.,* (the "Human Rights Law") and the New York City Administrative Code § 8-101, *et seq.* (the "City Law"), Defendants' retaliation under the FMLA, the Human Rights Law and City Law, and Defendants' acts of aiding and

abetting perceived and actual disability discrimination and failure to provide a reasonable accommodation in violation of the Human Rights Law and City Law.

2.      Plaintiff seeks compensatory and punitive damages, liquidated damages, attorneys' fees and other appropriate relief.

## JURISDICTION AND VENUE

3.      On December 29, 2017, Plaintiff filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), complaining of the unlawful discriminatory acts alleged herein.

4.      On April 27, 2018, Plaintiff received a Notice of Rights to Sue (upon request) issued by the EEOC on April 25, 2018.

5.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331,1332.

6.      This Court may assert supplemental jurisdiction over Plaintiff's Human Rights Law and City Law claims as authorized by 28 U.S.C. § 1367.

7.       A substantial part of the events giving rise to Plaintiff's claims occurred in the Southern District of New York and her employer Defendant ANet is located in the district, therefore the venue is proper in the District pursuant to 28 U.S.C. § 1391(b)(1) and (2) and 42 U.S.C. § 2000e-5(f)(3).

## PARTIES

8.      At all times relevant to this action, Plaintiff was and remains a resident of the State of New Jersey and is a Citizen of the United States.

9.      At all times relevant to this action, Plaintiff was an employee of and operating from the Defendant ANet's office located at 109 Nassau Street, New York, NY 10038, in the Southern District of New York.

10.    At all times relevant to the Complaint, Plaintiff was an employee of Defendant ANet within the meaning of 42 U.S.C. § 12111(4) of the Americans With Disabilities Act ("ADA").

11.    At all times relevant to the Complaint, Plaintiff was an "eligible employee" of Defendant ANet within the meaning of and 29 U.S.C. § 2611(2) of the Family Medical Leave Act ("FMLA") in that Plaintiff was employed by Defendant ANet for more than twelve months prior to the events underlying the lawsuit; and was employed for at least 1,250 hours during the 12-month period immediately preceding commencement of the leave which underlies the lawsuit. Defendant ANet employs more than 50 employees, operating within a 75-mile radius of where Plaintiff worked.

12.    Defendant ANet advised Plaintiff of her FMLA rights, extending them to her, as documented in its employee manual and as otherwise communicated, but nevertheless failed to comply therewith.

13.    At all times relevant to the Complaint, Plaintiff suffered from a serious health condition within the meaning of 29 U.S.C. § 2611(11).  Specifically, Plaintiff was diagnosed with breast cancer.

14.    At all times relevant to the Complaint, Plaintiff was a qualified individual with a disability as defined by Human Rights Law § 292(21) and City Laws § 8-102(16).

15.     Defendant ANet is an education non-profit that employs over one hundred and eighty (180) employees nationally.  As of 2016, Defendant ANet operated as a 501(c)3 organization, with an Annual Revenue of thirty three million, nine hundred forty two thousand nine hundred eighty five dollars ($33,942,985) and an Annual Surplus of four million, nine

hundred seventy four thousand six hundred twenty two dollars ($4,974,622).  Its national headquarters is located at 1 Beacon Street, Suite 200, Boston, MA 02108.

16.     At all times relevant to the Complaint, Defendant ANet was and is an employer within the meaning of 42 U.S.C. § 12111 (5) of the ADA and 29 U.S.C. § 2611(4)(a) of the FMLA.

17.     At all times relevant to the Complaint, Defendant ANet was an employer within the meaning of 29 U.S.C. § 2611(4) in that it is engaged in an industry affecting interstate commerce and employed more than 50 employees for each working day during each of 20 or more calendar workweeks in the current and preceding calendar year.

18.     At all times relevant to the Complaint, Defendant ANet was an employer within the meaning of the Human Rights Law § 292(5) and City Law § 8-102(5).

19.     Upon information and belief, Defendant Martin at all times relevant to the Complaint was and is a resident of the State of New Jersey but she supervises ANet staff in New York State.  Upon information and belief, she is a Citizen of the United States.

20.     At all times relevant to the Complaint, Defendant Martin was an employer within the meaning of 29 U.S.C. § 2611(4) in that she acted in the interest of Defendant ANet and ANet's other employees.

21.     Upon information and belief, Defendant Spooner at all times relevant to the Complaint was and is a resident of the State of Indiana, but she supervises ANet staff in New York State.  Upon information and belief, she is a Citizen of the United States.

22.     At all times relevant to the Complaint, Defendant Spooner was an employer within the meaning of 29 U.S.C. § 2611(4) in that she acted in the interest of Defendant ANet and ANet's other employees.

23.     Upon information and belief, Defendant Cockrell at all times relevant to the Complaint was and is a resident of the state of Maryland, but she supervises ANet staff in New York State.  Upon information and belief, she is a Citizen of the United States.

24.     At all times relevant to the Complaint, Defendant Cockrell was an employer within the meaning of 29 U.S.C. § 2611(4) in that she acted in the interest of Defendant ANet and ANet's other employees.

## STATEMENT OF FACTS

25.     In August of 2015, Plaintiff Sharon Wells began employment with Defendant ANet as the Managing Director of the Mid-Atlantic Region.

26.     On or about November 28, 2017 Plaintiff was reassigned to the position of Executive Director of the Upstate New York Network.

27.     Plaintiff's position was terminated on or about June 29, 2018.

28.     Defendant Martin was employed by Defendant ANet as the Vice President of the Mid-Atlantic Region, which was a supervisory role in which she operated with the authority to take tangible employment actions against the Plaintiff.

29.     Defendant Spooner was employed by Defendant ANet as the Chief Talent and Equity Officer, which was a supervisory role in which she operated with the authority to take tangible employment actions against the Plaintiff.

30.     Defendant Cockrell was employed by Defendant ANet as the Chief Network Officer, which was a supervisory role in which she operated with the authority to take tangible employment actions against the Plaintiff.

31.     On December 15, 2016, Plaintiff used personal paid time-off and presented to Leslie Simon Breast Cancer, where Plaintiff was then diagnosed with breast cancer.  Plaintiff immediately contacted her direct supervisor Defendant Martin via telephone conference and advised Defendant Martin of her cancer diagnosis and her urgent need to extend her absence for the remainder of the week to focus on her life-threatening reality.  Defendant Martin's demeanor changed and turned cold toward the Plaintiff, after hearing the news of her cancer diagnosis. Defendant Martin responded by instructing Plaintiff to call her back in two hours to walk her through a PowerPoint Presentation.  Defendant Martin failed to express empathy or concern that the Plaintiff was psychologically and physically shaken, and unfit, at that moment, to guide or support management through facilitation of the PowerPoint Presentation during Plaintiff's paid time off.

32.     On or about January 6, 2017, Defendants hired a new Managing Director for the Mid-Atlantic Region, Gwendolyn Stephens ("Ms. Stephens"). Ms. Stephens was Defendant Martin's friend of over sixteen years and her former mentor. At the time, Plaintiff was still employed by Defendant ANet in this role, and understood that she the Plaintiff, would maintain this title and role, as she had not been told otherwise.

33.     On or about January 11, 2017 Plaintiff formally requested, during a meeting with Defendant Martin and Ms. Stephens, to work remotely, with limited to no travel, supporting the Mid-Atlantic Region team administratively and with planning.  In so doing, Plaintiff requested to continue her work as a thought partner to coaches by helping them develop school plans, assisting with the professional development for partners, as well as viewing and transcribing coach video for future use during team meetings.  Defendant Martin responded by stating they would create a plan that would accommodate Defendant's needs and that would reflect her input and feedback.

6

Plaintiff's request was very reasonable and she was capable of performing the essential functions of the job with this accommodation.

34.     No written agreement addressing Plaintiff's request was provided by the Defendants.  Instead, a tentative team workplan was drafted, which in some ways served as a workplan for Ms. Stephens, Defendant Martin, and other staff during Plaintiff's intermittent leave, except that Defendant Martin failed to deliver or be held accountable for her portions of the assigned duties after Plaintiff began intermittent leave, thereby undermining the effectiveness of the tentative workplan.

35.     On or about January 20, 2017, Plaintiff advised Defendant Martin that additional testing was required regarding her cancer diagnosis.  Defendant Martin failed to acknowledge Plaintiff's diagnosis or medical concern, made no response to it whatsoever and coldly asked, "Will you miss the rest of the day?"

36.     Despite the reckless and inhumane treatment Plaintiff received after presenting her cancer diagnosis to Defendants in December of 2016, Plaintiff worked tirelessly by continuing to make trips to Boston, MA and Camden, NJ, as required by her manager, even at times when other able bodied staff were approved to not travel, until she began chemotherapy treatment on or about January 30, 2017.

37.     Due to the life-threatening nature of Plaintiff's diagnosis, the severity of chemotherapy on the human body, coupled with Defendants' clear lack of concern or support, Plaintiff began intermittent leave.

38.     Plaintiff did so after Defendants advised her that she was eligible for FMLA, per the ANet Employee Handbook and with guidance from the ANet Human Resources staff.  Plaintiff operated within those FMLA rights and ANet policies accordingly, in good faith.

39.     From or about January 30, 2017 through March 7, 2017, Plaintiff was on intermittent medical leave. By taking intermittent leave pursuant to the FMLA, Plaintiff believed this would give her the best opportunity to both maintain her employment and combat her life-threatening disability.  Plaintiff would have worked through her treatment and returned to work sooner after her medical procedures, had the work environment been more accommodating to her disability.

40.     On February 8, 2017, Plaintiff emailed Defendant Martin and ANet Human Resources Manager Lauren Jones ("Ms. Jones"), confirming her intent to return to work through intermittent leave on March 6, 2017.  Defendant Martin failed to respond to the email. Consequently, Plaintiff resent the email February 14, 2017.

41.     On February 14, 2017, Defendant Martin responded to Plaintiff's email, requesting that Plaintiff make updates to a work document while Plaintiff was out on leave. Plaintiff spoke with Defendant ANet HR about the request, and HR informed her that she would advise Defendant Martin that making requests of the Plaintiff to complete tasks while Plaintiff was out on leave were not permissible. Plaintiff then responded to Defendant Martin's request, indicating that Defendant Martin would need to make the updates since Plaintiff was out on leave. Defendant Martin then proceeded to update the document, fulfilling the request she had attempted to delegate to the Plaintiff.

42.     On or about March 3, 2017 at 5:15 pm, Plaintiff called and spoke with Defendant Martin confirming her intent to return to work on March 6, 2017.  Defendant Martin stated to Plaintiff in no uncertain terms, "your return to work would be too disruptive to the team," specifically referring to her "coming and going" on approved intermittent leave for chemotherapy and the need for accommodations not adequately provided in the workplan.

8

43.     During that same call, Defendant Martin then requested that Plaintiff extend her leave by two weeks to March 21, 2017, disregarding Plaintiff's ability to work during that time and interfering with how Plaintiff could expend her limited FMLA protected intermittent leave days.

44.     After ending the call, Plaintiff checked her email and saw she had received an email at 4:50 pm from Ms. Jones from Human Resources, inquiring as to why Plaintiff would not be returning to work March 6, 2017 as scheduled by Plaintiff.  In that email, Ms. Jones advised Plaintiff that she had received an email from Defendant Martin, Plaintiff's director supervisor, stating that Plaintiff "might not be able to return to work next week as planned."

45.     On March 3, 2017 and on March 6, 2017,  Plaintiff communicated to Ms. Jones that: (1) she was able and attempting to return to work as planned through her intermittent leave, (2) she was unaware of Defendant Martin's contacting HR to inform them that she may not return as planned, (3) she had since spoken with Defendant Martin but had been denied the ability to return to work as planned, and (4) Defendant Martin had requested Plaintiff delay her return to work until March 21, to avoid "disrupting" work by her "coming and going" intermittently.

46.     Ms. Jones responded that she would address Plaintiff's concerns and that it was fine for Plaintiff to return to work on Tuesday, March 7, 2017, after having spoken with Defendant Martin. In that conversation, Ms. Jones also stated that Plaintiff would need to provide a doctor's note authorizing her to return to work from intermittent leave.   ANet interfered with the intermittent medical leave that ANet agreed to provide Ms. Wells by requiring her to provide a return to work letter, despite that not being a requirement of intermittent leave under the FMLA. A doctor's authorization to return to work is only required under the FMLA in cases of continuous leave.

47.     On March 6, 2017, Plaintiff was not allowed to return to work, due to intentional interference by Defendants Martin and ANet.

48.     On March 6, 2017, Ms. Jones communicated with Defendant Martin regarding her attempt to interfere with Plaintiff's FMLA.

49.     On March 7, 2017, Plaintiff returned to work, per the advisement of Ms. Jones.

50.     However, upon Plaintiff's return to work on March 7, 2017, Defendant Martin again referred to Plaintiff's return as disruptive.

51.     On March 7, 2017, Defendant Martin then attempted to conceal her actions to interfere with Plaintiff's FMLA leave and misrepresented the facts in a group email including Defendant ANet employees.  Defendant Martin's email stated, "…Sharon [Plaintiff]…I am thrilled that you were able to return today as I wasn't expecting you back until 3/21 based on our last conversation. I got word from Lauren yesterday afternoon that you would definitely be returning today."

52.     On March 7, 2017, Plaintiff clarified in her email response to Defendant Martin that: (1) on February 8, 2017 Plaintiff had shared her intent to return to work on March 6, 2017, (2) that Defendant Martin had then shared concerns about Plaintiff's "coming in and going out" [on intermittent leave for her disability], being "disruptive", and (3) that they had only then discussed the possibility of her extending her leave until March 21 to be "less disruptive" to Defendants Martin and ANet.  Plaintiff further clarified, "I elected to speak to Lauren [Ms. Jones] about the intermittent leave. I believe she emailed you after our conversation and my move back to the original plan based on talking to her. I hope that you found the time with Lauren helpful in understanding FMLA."

53.     On March 7, 2017, Defendant Martin replied in an emailed response to Plaintiff, stating "Yes, I received a note from Lauren yesterday afternoon and gave her a call to clarify your return date." Defendant Martin did not deny Plaintiff's statements regarding Defendants' interference with Plaintiff's leave or Defendant's allegation that Plaintiff's working would be disruptive. Furthermore, Defendant Martin's response suggested that Defendant ANet did not take corrective action or provide further education to her regarding FMLA law.

54.     On March 7, 2017, Defendant Martin acknowledged the existence of the team workplan, which ANet had been repeatedly operating under when Plaintiff left for leave on January 30, 2017 and was operating under to date. Amongst other duties, this workplan stated that Defendant Martin was to act as Manager of the Syracuse District, in Plaintiff's absence, and to provide accommodation to Plaintiff by co-writing her 2x2 evaluations with her.

55.     On March 8, 2017 Defendant Martin insisted that Plaintiff conduct the 2x2 evaluations for staff but failed to provide Plaintiff with the appropriate information and co-writing support documented in the workplan as promised. Plaintiff, seeking to obtain the information needed to fulfill her duties, asked Defendant Martin, "Who has been managing New York in my absence?" Defendant Martin responded "No one", thereby evidencing that while Defendants appeared to accommodate Plaintiff on paper in the workplan; they had not done so in action.  In fact, as a result of Defendant Martin failing to manage Syracuse in Plaintiff's absence, Defendant Martin intentionally and/or negligently sabotaged Plaintiff.

56.     During the period in which Plaintiff underwent chemotherapy, Defendant Martin continuously pressured Plaintiff to perform evaluations for individuals that she was unable to observe or work closely with during the observation quarter and without the accommodated information and support Defendant Martin was supposed to provide.  Plaintiff advised Defendant

Martin that she was uncomfortable with such instructions, as she had not observed them and did not have access to all of the information required for her to do so with ethical professionalism. However, Plaintiff was continuously pressured by Defendant Martin, despite her ethical concerns.

57.     From March 13 through March 17, 2017, Plaintiff took intermittent medical leave for treatment.

58.     On March 22, 2017, Defendant Martin initiated a conference call with Defendant ANet's Chief Talent and Equity Officer, Defendant Spooner, and Plaintiff to discuss the workplan. During this call, a new workplan was presented that was drafted without Plaintiff's knowledge or participation and was to be reviewed further with Plaintiff on this call.   In this plan, the Plaintiff's territories and staff in New Jersey were delegated to Ms. Stephens, with the exception of territories in New York City and Syracuse, which remained under an accommodated workplan to be managed by Plaintiff and Defendant Martin. However, Defendant Martin later failed to complete the accommodated work that she was assigned and increasingly shifted this work back to Plaintiff and/or to Ms. Stephens.

59.     The introduction of the new and different workplan came as a surprise to Plaintiff and had been developed by Defendant Martin as an alternative to the original workplan. Defendants Martin and Spooner were familiar with the new workplan, which had not been provided to the Plaintiff prior to the meeting.

60.     During this call, Plaintiff made note that the new workplan included a change of responsibilities that deviated from accommodating her medical needs.

61.     Defendant Martin presented a workplan that did not provide the reasonable accommodations Plaintiff had suggested, but instead, reduced Plaintiff's responsibilities into a position supervising two territories in the Mid-Atlantic Region: Syracuse and New York City.

62.     During this call, Plaintiff again requested if she could be accommodated through a temporary reassignment to a support role in which Plaintiff would help education coaches throughout the Mid-Atlantic Region to draft agendas for meetings and professional development for school staff, and prepare video for use during team meetings. This reasonable accommodation would have allowed Plaintiff to continue to perform her essential job, while exercising intermittent leave. However, Defendants refused to discuss this suggestion and denied Plaintiff's reasonable accommodation request.

63.     During this call, Plaintiff expressed concern about managing both territories in the manner assigned and asked if an accommodation could be made in which she managed the New York City territory only, given that it was reasonably close to her residence, office, and medical care facilities (within 5 miles from all), and that her driving was limited due to her disability, which Defendants were aware of.  Defendant Martin stated that the workplan was as it needed to be and did not offer to reconsider or change the workplan.

64.     During this call, Plaintiff also expressed concern that she was being asked to meet the same management expectations and level of work as someone working fulltime when she would not be working fulltime hours. Defendant Martin insisted that her scope of work, goals and expectations could not change from what was being presented to accommodate her disability or leave for treatment. Defendant Martin told Plaintiff that "time off" was her accommodation and Defendant Spooner followed up by stating that "Intermittent Leave WAS the accommodation." This statement further indicated Defendants' incorrect and unlawful interpretation and management of Plaintiff's FMLA and ADA rights.

65.     During this call, Plaintiff expressed that she felt pressured to agree with the plan, as both Defendants Martin and Spooner held supervisory roles senior to her, and both continued

to reiterate the plan, dismiss Plaintiff's suggestions and concerns, and fail to exhibit openness to changing the plan they were presenting to accommodate her.

66.    During this call, Plaintiff voiced her concern over Defendant Martin's ability to lawfully manage Plaintiff while Plaintiff was disabled and requiring use of FMLA and asserted the allegations set forth above in this Complaint. She voiced her concern that Defendant Martin's decisions regarding her accommodations discouraged her from rightful use of her FMLA protected right to intermittent leave.

67.    On March 22, 2017, Defendant(s) failed to engage in a good faith interactive process, by failing to adequately consider the Plaintiff's request and needs for accommodation and failing to offer and discuss available alternatives.

68.    Instead, Defendants groomed and prepared Ms. Stephens to take over Plaintiff's job responsibilities. Thereafter, they intentionally and gradually, through accommodation workplan revisions, discouraged Plaintiff from utilizing her FMLA as she wanted to, and phased out and eventually eliminated Plaintiff's job position(s) and opportunity for employment and promotion at Defendant ANet, due to Plaintiff's disability.

69.    They did so strategically, without transparency or clarification of such plans to the Plaintiff, causing the Plaintiff to endure undue confusion, stress, and emotional pain that threatened her recovery from cancer and interfered with her ability to work using FMLA leave.

70.    On March 22, 2017, Defendants ended the conversation, but rescheduled its continuation on March 24, 2017.

71.    On March 24, 2017, Plaintiff participated in a continuance of the conference call with Defendants Spooner and Martin, who again failed to engage in a good faith interactive

process, by failing to consider the Plaintiff's request and needs for accommodation and failing to offer and discuss any available alternatives.

72.     On this call, Plaintiff expressed concerns regarding "the misalignment between Defendant Martin's words and actions" and the "aggressive, hostile non-empathetic way that communication has transpired." Defendant Martin coldly responded, "I am sorry if I made you feel this way."

73.     On this call Plaintiff also communicated, "I appreciate and accept your apology, Teimosa [Defendant Martin].  I do still have concerns because there was nothing stated about changing behaviors to ensure that those things do not happen again.  Change is a process that takes time and requires grace from all parties.  What is at stake for me [survival] is too great to play with time…Again, I realize change is a process and takes time. But I can't risk that." Plaintiff then informed Defendant Spooner and Defendant Martin that she felt pressured by their conversations that week with her and had decided that, "I will be out on continuous leave, effective April 3."

74.     On March 24, 2017, Plaintiff determined and informed Defendants that she would need to change her FMLA protected leave from "intermittently working while undergoing treatment," to FMLA protected leave that is "continuous" until she is healthy enough to re-engage in the work environment created by the Defendants, as a result of Defendants' actions and failures. Plaintiff's doctor, in turn, then confirmed that continuous leave was appropriate, given the circumstances and challenges faced by Plaintiff during the attempted intermittent leave.

75.     Defendants' interference with Plaintiff's FMLA, disability discrimination, and retaliation against Plaintiff constitute adverse employment actions.

76.     From April 3 through June 7, 2017, Plaintiff was on continuous medical leave for treatment.

77.     On May 31, 2017, Plaintiff advised Defendant Martin via email and voicemail that she would return from continuous leave on June 8, 2017 until her surgery, which at the time was scheduled for July.  Plaintiff received no reply.

78.     On June 8, 2017, Plaintiff returned to work.

79.     On June 8, 2017, upon Plaintiff's return, Defendant Martin advised that she did not have a workplan for Plaintiff but would prepare one.

80.     On June 14, 2017, Plaintiff informed Defendant(s) that she was suffering a temporary infection of her fingernails as a result of her weakened immune system from chemotherapy, and temporarily would need to communicate verbally by phone, as her infection temporarily limited her typing capacity.  Defendant Martin acknowledged her email and offered to call her to discuss it further. However, the following day on June 15, 2017, Defendant Martin directed Plaintiff to complete a self-evaluation that required extensive typing.  The allegations set forth in the paragraphs of this Complaint show a clear pattern of disability discrimination and retaliation for Plaintiff exercising her rights pursuant to the FMLA and a violation of the ADA, state and local law.

81.     On June 19, 2017, Plaintiff disclosed to Siobhan Ehle ("Ms. Ehle"), one of Defendant ANet's Human Resources representatives, that Defendant Martin created a hostile work environment with Plaintiff due to her disability.

82.     On June 28, 2017, Defendant Martin, joined by "Ms. Ehle", conducted Plaintiff's End of Year Review in a hotel lobby, one week prior to Plaintiff's medical leave for a bilateral mastectomy. Defendants conducted this review of Plaintiff without adjusting Plaintiff's goals, despite the fact that the Plaintiff had worked an accumulation of only five weeks in the five-month period preceding the review, and despite the fact that Defendant Martin had neglected to fulfill

tasks related to the goals and team performance in New York, which Defendant Martin was assigned during Plaintiff's period of leave.

83.    During this End of Year Review meeting, Defendant Martin advised Plaintiff that her position was being changed again, and that she would now be responsible for only managing the Syracuse Region, two hundred and fifty (250) miles from Plaintiff's New Jersey residence and New York office.  Defendant Martin informed Plaintiff that she would no longer be responsible for the New York City Region.

84.    Defendant Martin advised Plaintiff of this knowing that Plaintiff was scheduled for a Bilateral Mastectomy with DIEP Flap Reconstruction on July 5, 2017. Defendants' made this decision, with awareness of and despite the Plaintiff's prior accommodation request of limited travel by car during her cancer treatment and recovery time periods.

85.    In this meeting, Plaintiff expressed her concern and requested that if Defendants were going to reduce her to one territory, that they consider assigning her to the New York City territory that she'd been managing and that was five miles from her home, office and medical facilities, and would provide a very reasonable accommodation for her disability. Defendant Martin declined to consider Plaintiff's request and insisted that no changes be made to the plan.

86.    In this meeting, Plaintiff raised concerns that Defendant Martin's flow of work, leadership, and employment decisions reflected significant disregard for employee rights and Defendant ANet's policies, and were discriminatory and retaliatory.  Defendant Martin then proceeded to escalate the discussion in an argumentative manner. The conversation was then interrupted and ended by Ms. Ehle, who corrected the Defendant Martin, outlined next steps and concluded the meeting.

87.     On June 28, 2017, immediately following the meeting, Plaintiff disclosed to Ms. Ehle that she would be filing a formal written complaint against Defendant Martin when she returned from leave.  Plaintiff also disclosed that she felt the decision by Defendant Martin to assign her to Syracuse, instead of New York City, was intended to push her out of her job and encourage her to leave her employment with Defendant ANet.

88.     Ms. Ehle closed by assuring Plaintiff that she would be working with the team to improve Defendant Martin's pattern of leadership during Plaintiff's medical leave.

89.     This action on June 28, 2017 indicates that Defendant ANet was capable of accommodating Plaintiff's initial request to manage one region, in which Plaintiff requested to manage the New York City region, due to its' geographical proximity to where she lives, reports to work, and receives medical care, and due to the fact that she had managed it prior to that date.

90.     This action also implies that Defendant ANet was capable of accommodating Plaintiff's requests for geographical accommodation but refused to do so by Defendants' choosing. Defendants' action to reduce the Plaintiff's duties to one region, but to do so by removing her from the region that was geographically close to her, and instead solely assigning her to a region four hours and thirty minutes from her geographical area, was unreasonable and intended as discriminatory retaliation intended to discourage and dissuade Plaintiff from continuing in her employment with Defendant ANet and on Defendant Martin's team.

91.     Furthermore, this action was made by Defendants' intentionally to prevent placing Plaintiff in the position of Executive Director of New York City, which would require them to retain her after her recovery and after restructuring in the upcoming year.

92.     On July 7, 2017, Plaintiff underwent a bilateral mastectomy, and then an additional follow up surgery was required on July 12, 2017, and additional treatment for cancer was required after her recovery from the surgeries.

93.     From July 5 through November 27, 2017, Plaintiff was on continuous medical leave.

94.     On or about September 20, 2017, Plaintiff spoke with Ms. Jones about the possibility of paying for COBRA benefits out of pocket while completing radiation therapy, and the managing up needed to ensure Defendant Martin would not further interfere with Plaintiff's treatment and employment.

95.     On September 24, 2017, Plaintiff notified HR that she would remain out on continuous leave, "I just wanted to let you know that I was not able to speak with my doctor Wednesday because she had gone home early because of Rosh Hashanah.  So, I will to speak with her Monday. When I talk to her, I will follow your recommendation and ask her how to best minimize the stress and anxiety I am feeling about returning to work given the team culture issues, and tension that exists between my direct manager and I.  My next steps will be aligned with her advice."

96.     From July 5, 2017 through November 27, 2017, Plaintiff remained on continuous medical leave, with approval from her doctor and Defendant ANet.

97.     On November 22, 2017, Plaintiff submitted an electronic time-off request for December 15, 2017.  Defendant Martin failed to respond for over two weeks so Plaintiff followed up for an update on December 4, 2017.  Plaintiff was then contacted by Defendant Martin's Supervisor, Defendant Cockrell, to discuss her request, during which she learned that Defendant Martin had escalated Plaintiff's time-off request in a disciplinary fashion, without discussing the

matter with her.  Defendant Martin did not approve the request until December 16, 2017, the day after the date actually requested.

98.     On November 27, 2017, Plaintiff returned to work from continuous medical leave.

99.     On November 28, 2017, Defendant Martin met with Plaintiff and asked Plaintiff for her "vision regarding the Upstate New York Network." Plaintiff advised that she had not yet had the opportunity to develop one, being that it was the second day of her return to work. Defendant Martin repeated the same question. Plaintiff replied that it would be helpful to have the Defendant Martin share her insights on the Upstate New York Network to help the Plaintiff construct a vision that aligns with her own. Defendant Martin stared at her and repeated the same question, refused to advise or support the Plaintiff, and began to shake her leg and tap her hand in a physically aggressive manner.

100.     On November 29, 2017, Plaintiff shared the incident with Defendant Cockrell, who then belittled the Plaintiff's complaint, in turn criticizing the Plaintiff's perception of the incident, and instructing her that she, "should not make any judgment based on body language."

101.     On December 20, 2017, Defendant Martin met with Plaintiff to discuss Plaintiff's annual goals.  Defendant Martin advised that Plaintiff's goals would not be adjusted in any way to account for the five months that Plaintiff missed from work for medical leave, after the 2017-2018 year began in July 2017. Defendant Martin, therein, again failed to engage in a good faith interactive process, discriminated against Plaintiff because of her disability, and refused to make a reasonable accommodation.

102.     On December 29, 2017, Plaintiff filed a complaint with the EEOC.

103.    On or about January 12, 2018, Defendant ANet received notice from the EEOC of Plaintiff's complaint, pursuant to the EEOC policy to notify Defendants within ten days of the filing of a complaint.

104.    On April 13, 2018, Plaintiff met with Defendant Cockrell, and they discussed Defendant Cockrell's plans for the Plaintiff's future employment and possibilities within ANet for the upcoming 2018-2019 calendar year. Defendant Cockrell requested Plaintiff inform her regarding Plaintiff's "appetite" for her current role in the upcoming year.

105.    On April 17, 2018, Plaintiff reiterated via email, "I am deeply committed to the work we do here at ANet and have contributed in various ways to our impact. Wherever you see the need, I am ready to roll my sleeves up and apply my skills in a way that will be both beneficial and sustainable to the organization. I look forward to connecting with you and learning what direction we will take in the next few days."

106.    On April 20, 2018, Defendant Cockrell emailed Plaintiff, "My hope was to do a few things in the past 48 hours since our conversation on Tuesday. That conversation was a follow up to our conversation the week before where I asked you about your particular motivation to continue in the role of ED, knowing that the upcoming year would likely require increased cultivation and travel given the Syracuse partnership is shrinking and reaching later stage. You expressed a desire to continue to work at ANet, feeling an authentic alignment to our mission and core values.  I expressed that after two conversations, I did not hear a specific motivation to do the cultivation work that will be required. However, pending my decision you may have interest finding another role that is a better fit, whether within or outside of ANet…

107.    Under consideration is eliminating the role of Executive Director.  That said, my hope is to have a response for you by Monday morning at the latest. I appreciate your patience."

Here, Defendant establishes a false pretext in which Defendant prepares to reduce, phase out, and all together eliminate Plaintiff's job position because of her disability, and in retaliation for engaging in the protected activities including but not limited exercising her rights under the FMLA, filing a Charge with the EEOC, and continuously reporting unlawful employment practices of Defendant Martin.

108.    On or about April 21, 2018, Plaintiff emailed Defendant Cockrell, reiterating that the alleged concerns regarding the Plaintiff's appetite or willingness to conduct the full scope of the duties required in Syracuse were not based in fact.  Plaintiff proceeded to recall a history of conversations and facts, in the period of time during which she'd managed Syracuse, in which she'd exhibited both an eagerness and a capacity to fulfill the exact work Defendant Cockrell was suggesting she "did not have an appetite" for.  Plaintiff reiterated her complete eagerness, willingness, and capacity to do the work required of her position in Syracuse in the upcoming year. She also clarified that she was ready to do any work that ANet identified to be fit for her.

109.    On or around Wednesday, April 25, 2018, the EEOC notified Defendant ANet that it had granted the Plaintiff a "right to sue" letter, granting Plaintiff permission to sue Defendant within the following 90 day-period.

110.    In retaliation, on Tuesday, May 1, 2018, Defendant Cockrell informed Plaintiff that her role as Executive Director of Upstate New York was being eliminated and that her employment would end on June 30, 2018.

111.    On June 29, 2018 Plaintiff's employment with Defendants ended.

112.    On or around May 28, 2018, Defendants posted an Employment Position publicly, for a position in Syracuse titled "Network Associate – Syracuse Region." This position post included a start date of July 1, 2018. The job description included all of the duties Plaintiff was

tasked with in her role managing the Syracuse region during 2017-2018. The position was posted to start immediately after Plaintiff's position was eliminated.  Defendants have unlawfully acted to end Plaintiff's employment at ANet under the ruse of "eliminating her position out of necessity," when they have in fact maintained the exact position she was in, but changed the name of the title associated with the job. The job itself is one in which Plaintiff was well qualified for and capable of performing. Furthermore, the job posting indicated that it would report to the Executive Director of New England, which appears to be a temporary assignment.

113.   On or around May 28, 2018, Defendants posted an Employment Position publicly, for a position in New York City, titled "Network Associate – New York City Region." This position post included a start date of July 1, 2018. The job description included all of the duties Plaintiff was tasked with in her role managing the Syracuse region during 2017-2018, and prior during the period in which she managed both Syracuse and New York City.  The job description matches the duties Plaintiff requested as accommodation in June of 2017. This position was posted to start immediately after Plaintiff's employment with ANet was terminated. The job itself is one in which Plaintiff was well qualified for and capable of performing. Furthermore, this job posting indicated that it would report to the Executive Director of New York City Metro, which is also a position in which Plaintiff was qualified and capable of performing.

114.   On or around May 28, 2018, Defendant ANet posted an Employment Position publicly, for a position titled "Vice President, Mid- Atlantic Region." This posting included a start date of July 1, 2018.  The job itself is one in which Plaintiff was well qualified to be promoted to, based on her exemplary employment history as the Managing Director of the Mid-Atlantic Region from 2015-2017.

115.    On or about the first week of June, Plaintiff conferenced with Defendant Cockrell to discuss the opening for the Vice President of the Mid-Atlantic Region.  On that call, Defendant Cockrell stated that she was "building her team and that it was important that whoever takes on that role in the Mid-Atlantic Region be able to get along with the current team."  Ms. Cockrell clarified that her concern was regarding the relationship between Plaintiff and Defendant Martin.

116.    On or about July 2, 2018, Defendant Martin was assigned to a new team and new region in California.

117.    It is clear that Ms. Cockrell aided and abetted the discriminatory practices implemented by Teimosa Martin and ANet Defendants against Plaintiff.

118.    It is clear that Ms. Cockrell in aiding and abetting those discriminatory practices, implemented measures to eliminate Plaintiff's employment with ANet by denying her promotional opportunities for which she was well qualified.

119.    The Plaintiff was capable of performing the essential functions of this job.

120.    Due to plaintiff's disability, and in retaliation of Plaintiff's charges, Defendants have failed to offer the Plaintiff any position within Defendants' organization.

121.    In the past, Defendant ANet has accommodated and restored other employees in similar circumstances, as is consistent with their Employee Handbook, which states, "If you take FMLA leave, you will be restored to the same or an equivalent position when you return to work provided that your job still exists and you would have continued to remain in that job if you had not taken leave." Plaintiff operated in good faith that Defendants would honor this policy, as they had done for other employees.

122.    Defendant ANet employee, Laura Brinkman, was allowed to work on a four-day work week upon returning from breast cancer treatment and was allowed to maintain her

employment title and role, receiving support and accommodation during her period of treatment for breast cancer, and upon her return. She remains stably employed with ANet to date as the Director of New Partnerships of the Central West Region.

## FIRST CAUSE OF ACTION: ADA DISABILITY DISCRIMINATION

123.   Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

124.   Plaintiff suffered from a disability that is covered by the ADA.

125.   Plaintiff was otherwise qualified to perform essential job functions with or without reasonable accommodations.

126.   Plaintiff's disability interfered with essential functions as Plaintiff was forced to undergo chemotherapy treatment and surgeries.

127.   Defendants knew of Plaintiff's disability.

128.   Defendants separately and together discriminated against Plaintiff on the basis of her disability, in violation of the ADA, by failing to engage in a good faith interactive process, by refusing to make a reasonable accommodation for her disability, by interfering with Plaintiff's FMLA rights, by interfering with Plaintiff's employment performance reviews, and by eliminating Plaintiff's job position because of her disability.

129.   Plaintiff has suffered adverse employment actions as a result of Plaintiff's unlawful discriminatory conduct.

130.   As a result of Defendants' disability discrimination, Plaintiff has suffered severe damage, including lost wages, deprivation of income and benefits, loss of opportunity for advancement and promotion, and has suffered and continues to suffer severe mental anguish,

emotional pain and suffering, humiliation, damage to reputation and career, and other compensable injuries.

## SECOND CAUSE OF ACTION: ADA RETALIATION

131.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

132.    In Violation of the ADA, Defendants separately and together unlawfully retaliated against Plaintiff for exercising her rights under the FMLA to take leave to combat cancer: by refusing to provide her with reasonable accommodations, by interfering with Plaintiff's FMLA Rights, by forcing plaintiff to take continuous leave to fight the battle to save her life, by advising Plaintiff that her return to work would be "disruptive", by pressuring Plaintiff to perform performance reviews for individuals she did not observe during the period she was on leave without providing the stated accommodations, by failing to adjust Plaintiff's goals upon her return to take into consideration the time she took through exercising her FMLA Leave, by failing to uphold the workplan whereby Defendant Martin would manage New York while Plaintiff was on FMLA Leave and inform Plaintiff as needed upon her return, by failing to uphold the accommodation workplan whereby Defendant Martin would be responsible to co-construct 2x2 evaluations with Plaintiff, by failing to engage in a good faith interactive process and then refusing to make a reasonable accommodation, by failing to approve Plaintiff's electronic request for a day off in a timely manner and then approving the date one day after that the date Plaintiff requested, and by eliminating plaintiff's position and failing to provide her with an available position, which she is qualified for within the Defendants' organization, despite Plaintiff's repeated and documented requests.

133.    Plaintiff has suffered severe damages, including lost wages, deprivation of income and benefits, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' unlawful conduct.

### THIRD CAUSE OF ACTION: FMLA INTERFERENCE

134.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint with the same force and effect as if fully set forth herein.

135.    By the aforementioned actions, Defendants separately and together, have interfered with, restrained and denied Plaintiff her rights under the FMLA in violation of 29 U.S.C. § 2612(d), 2614(a), 2615(a), and 2615(b).

136.    As a result of Defendants' interference with her FMLA rights, Plaintiff has suffered severe damage, including lost wages, deprivation of income and benefits, loss of opportunity for advancement and promotion, and has suffered and continues to suffer severe mental anguish, emotional pain and suffering, humiliation, damage to reputation and career, and other compensable injuries.

### FOURTH CAUSE OF ACTION: FMLA RETALIATION

137.    Plaintiff repeats and realleges each and every allegation set forth in this Complaint with the same force and effect as if fully set forth herein.

138.    By the aforementioned actions, Defendants separately and together, have retaliated against Plaintiff for exercising her rights under the FMLA, in violation of 29 U.S.C. § 2612(d), 2614(a) and 2615(a) and 2615(b).

139.    As a result of Defendants' unlawful retaliation, Plaintiff has suffered severe damage, including lost wages, deprivation of income and benefits, loss of opportunity for

advancement and promotion, and has suffered and continues to suffer severe mental anguish, emotional pain and suffering, humiliation, damage to reputation and career, and other compensable injuries.

### FIFTH CAUSE OF ACTION: VIOLATION OF NEW YORK CITY LAW & HUMAN RIGHTS LAW DISABILITY DISCRIMINATION (ACTUAL AND PERCEIVED)

140.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

141.    At the all times referred to in this Complaint where Defendants separately and together failed to reasonably accommodate plaintiff's disability, discriminated against Plaintiff as alleged herein because of her disability, and engaged in discriminatory and unlawful employment action as specified herein, Plaintiff was a qualified individual with an actual disability as defined by Human Rights Law § 292(21) and City Law § 8-102(16) who was able to perform essential functions of her position in a reasonable manner with or without reasonable accommodation.

142.    Defendants regarded and/or perceived Plaintiff as disabled (as defined by Human Rights Law § 292(21) and City Laws § 8-102(16)(a) by virtue of her medical condition as alleged above.

143.    Defendants individually and together discriminated against Plaintiff because of her disability as alleged herein.

144.    Plaintiff was qualified to (and did) perform the essential functions of her position with or without reasonable accommodation,

145.    By the aforementioned actions, Defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of her employment,

on the basis of her actual or perceived disability, in violation of Human Rights Law § 296(1) and City Law § 8-107(6).

146.    As a result of the Defendants' discriminatory conduct, Plaintiff has suffered severe damage, including lost wages, deprivation of income and benefits, loss of opportunity for advancement and promotion, and has suffered and continues to suffer severe mental anguish, emotional pain and suffering, humiliation, damage to reputation and career, and other compensable injuries.

**SIXTH CAUSE OF ACTION: VIOLATION OF
NEW YORK CITY LAW & HUMAN RIGHTS LAW
AIDING AND ABETTING DISABILITY
DISCRIMINATION (ACTUAL AND PERCEIVED)**

147.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

148.    At the all times referred to in this Complaint where Defendants separately and together failed to reasonably accommodate plaintiff's disability, discriminated against Plaintiff as alleged herein because of her disability, and engaged in discriminatory and unlawful employment action as specified herein, Plaintiff was a qualified individual with an actual disability as defined by Human Rights Law § 292(21) and City Law § 8-102(16) who was able to perform essential functions of her position in a reasonable manner with or without reasonable accommodation.

149.    Defendants separately and together perceived Plaintiff as disabled (as defined by Human Rights Law § 292(21) and City Law § 8-102(16)(a) by virtue of her medical condition listed above.

150.    By the aforementioned actions, Defendants separately and together, have aided and abetted disability discrimination against Plaintiff in the terms, conditions, and privileges of

employment, on the basis of her actual or perceived disability, in violation of the Human Rights Law § 296(6) and City Law § 8-107(6).

151.     As a result of the aiding and abetting disability discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including lost wages, deprivation of income and benefits, loss of opportunity for advancement and promotion, and has suffered and continues to suffer severe mental anguish, emotional pain and suffering, humiliation, damage to reputation and career, and other compensable injuries.

**SEVENTH CAUSE OF ACTION: VIOLATION OF
NEW YORK CITY LAW & HUMAN RIGHTS LAW
FAILURE TO PROVIDE REASONABLE ACCOMMODATION**

152.     Plaintiff repeats and realleges each and every allegation set force in this Complaint with the same force and effect as if set forth fully herein.

153.     By the aforementioned actions, Defendants separately and together, failed to reasonably accommodate Plaintiff's known disability in violation of Human Rights Law § 296(3) and City Law § 8-107(15).

154.     As a result of Defendants' failure to provide a reasonable accommodation, Plaintiff has suffered severe damage, including lost wages, deprivation of income and benefits, loss of opportunity for advancement and promotion, and has suffered and continues to suffer severe mental anguish, emotional pain and suffering, humiliation, damage to reputation and career, and other compensable injuries.

**EIGHTH CAUSE OF ACTION: VIOLATION OF
NEW YORK CITY LAW & HUMAN RIGHTS LAW
RETALIATION**

155.     Plaintiff repeats and realleges each and every allegation set forth in this Complaint with the same force and effect as if set forth fully herein.

156.    By the aforementioned actions, Defendants separately and together, retaliated against Plaintiff for exercising her rights under The FMLA to take leave to combat cancer by refusing her accommodation Plaintiff's requests to manage New York as oppose to Syracuse and New York, interfering with Plaintiff's FMLA Rights, forcing plaintiff to take continuous leave to fight the battle to save her life, advising Plaintiff that her return to work would be "disruptive", pressuring Plaintiff to perform performance reviews for individuals she did not observe during the period she was on leave, failing to adjust Plaintiff's goals upon her return to take into consideration the time she took through exercising her FMLA Leave, failing to uphold the workplan where Defendant Martin would manage Syracuse while Plaintiff was on FMLA Leave, failure to uphold the accommodation workplan where Defendant Martin would be responsible to co-construct 2x2 evaluations with Plaintiff, failing to approve Plaintiff's  electronic  request for a day Off and Actually Approving the a date one day later than that the date Plaintiff requested, and eliminating plaintiff's position and failing to provide her with a position she is qualified for within Defendants' organization, despite Plaintiff's repeated and documented requests in violation of Human Rights Law § 296(3) and City Law § 8-107(7).

157.    Plaintiff has suffered severe damages, including lost wages, deprivation of income and benefits, promotional opportunities and other benefits and compensation, and has suffered and continues to suffer severe mental anguish, emotional distress, humiliation and other compensable injuries as a result Defendants Failure to provide a reasonable accommodation.

**WHEREFORE**, Plaintiff demands that judgment be entered in her favor and that the Court order and award Plaintiff the following relief against Defendants:

A.      Compensatory damages for lost wages, deprivation of income and benefits, promotional opportunities, and other benefits and compensation, emotional pain and suffering, mental anguish, distress, humiliation and loss of reputation in an amount to be determined at trial;

B.      Punitive damages in an amount to be determined at trial

C.      Liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii)

D.      Attorneys' Fees

E.      Costs and Disbursement

F.      Interests

G.      Such other and further relief as this Court may deem just and proper

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands that this proceeding be tried by a jury.

Dated: New York, New York
      July 22, 2018

The Law Offices of Damon McDougal, LLC

By:_____/s/_____
    Damon McDougal *(pro hac vice)*


    60 Park Place, Suite 1104
    Newark, New Jersey 07102
    973.536-5470
    mcdougallaw.dm@gmail.com
    *Attorney for the Plaintiff*