UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHARON WELLS,

                    Plaintiff,

                    -v.-

THE ACHIEVEMENT NETWORK, TEIMOSA
MARTIN, MELINDA SPOONER, and KIMBERLY
COCKRELL

                    Defendants.

---

18 Civ. 6588 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Sharon Wells brings claims pursuant to the Family Medical Leave Act (the "FMLA"), 29 U.S.C. §§ 2601 to 2654; the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12111 to 12117, 12131 to 12165, 12181 to 12189, 12201 to 12213; the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec Law. §§ 290 to 297; and the New York City Human Rights Law (the "NYCHRL"), N.Y. Admin. Code §§ 8-101 to 8-131, against her former employer, The Achievement Network, Ltd. ("ANet"), and ANet employees Teimosa Martin, Melinda Spooner, and Kimberly Cockrell (the "Individual Defendants" and collectively with ANet, "Defendants"). Defendants now move, without opposition, for summary judgment against Plaintiff pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motion is granted in full.

# BACKGROUND[1]

## A.   Factual Background

### 1.   The Parties

ANet is an educational not-for-profit organization that works alongside school leadership teams with the goal of improving results for students in underserved communities.  (Def. 56.1 ¶ 1).  Plaintiff Sharon Wells was hired by ANet in July 2015 for the position of Managing Director of its New York-New Jersey Network.  (*Id.* at ¶ 17).  She was subsequently elevated to Executive Director of ANet's Mid-Atlantic Region in mid-2017 (*id.* at ¶ 167), until her role was eliminated by ANet in June 2018 (*id.* at ¶ 223).  During the period in which

---

[1]   The facts set forth in this Opinion are largely drawn from Defendants' submissions in support of their motion for summary judgment.  Defendants' Local Rule 56.1 Statement of Undisputed Material Facts is referred to as "Def. 56.1" (Dkt. #66).  Plaintiff's Complaint is referred to as "Compl." (Dkt. #1).

Citations to Defendants' Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein.  *See* Local Rule 56.1(c).  Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Rule 56.1(c), (d); *Biberaj* v. *Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012).  And where a nonmoving party fails to respond to a Local Rule 56.1 Statement, the court is "permit[ted] …. to conclude that the facts asserted in the statement are uncontested and admissible."  *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).  However, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed."  *Jackson* v. *Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014).  "In so doing, the Court may rely on other evidence in the record even if uncited."  *Id.* (citing Fed. R. Civ. P. 56(c)(3)).  In recognition of this obligation, and in fairness to Plaintiff, the Court has considered Plaintiff's statements and pleadings where relevant in the course of deciding the instant motion.

For ease of reference, Defendants' brief in support of their motion for summary judgment is referred to as "Def. Br." (Dkt. #70).  References to attorney and witness declarations and affidavits submitted in support of Defendants' motion, and the exhibits contained therein, are referred to using the convention "[Name] Decl."  Citations to Plaintiff's deposition will be referred to using the convention "Pl. Dep." (Dkt. #67-3).  Other submissions will be cited by their docket entry number.

Plaintiff was employed by ANet, she worked from ANet's New York City office. (*Id.* at ¶ 18).

Kimberly Cockrell is ANet's Chief Network Officer, and is responsible for overseeing service delivery to districts and schools across the country, as well as sales and growth cultivation throughout ANet. (Def. 56.1 ¶ 7). Melinda Spooner worked at ANet as Chief Talent and Equity Officer from 2016 to 2019, where she was responsible for overseeing ANet's Human Resources Department. (*Id.* at ¶ 8). Teimosa Martin is currently the Vice President of ANet's West Region, though she has held other roles at ANet in which she supervised Plaintiff, including as Executive Director of ANet's New Jersey-New York Network and as Vice President of ANet's Mid-Atlantic Region. (*Id.* at ¶¶ 9, 23-24, 35).

### 2. ANet's Leave Policies

As relevant here, ANet permits qualified employees to take medical leaves of absence in accordance with the FMLA, pursuant to which certain covered employees are provided with up to 12 weeks of unpaid job-protected leave each year. (Def. 56.1 ¶ 14). ANet also permits medical leave under the ADA and applicable state law. (*Id.*). Additionally, ANet maintains a Leaves of Absence Policy that provides that ANet will endeavor to grant accommodations to employees who need leave, but cannot guarantee that all leave requests will be granted. (*Id.*). ANet's leave process, including its FMLA leave, is administered through a third-party vendor, Insperity PEO Services, L.P. ("Insperity"), which

is responsible for communicating with ANet employees regarding their eligibility for FMLA leave.  (*Id.* at ¶¶ 15-16).

### 3.    ANet's Initial Restructuring and Plaintiff's Role

Prior to June 2015, ANet was organized into state-specific "networks," including separate networks for New York and New Jersey.  (Def. 56.1 ¶ 20).  Each network partnered only with schools and districts within its own state.  (*Id.*).  In June 2015, ANet combined the New York and New Jersey networks into a single network (the "NJ-NY Network") that partnered with approximately 76 schools in cities in New York, New Jersey, and Pennsylvania.  (*Id.* at ¶¶ 21-22).  In July 2015, Plaintiff was hired as Managing Director of the newly-formed NJ-NY Network, reporting directly to Defendant Martin, the Executive Director of the NJ-NY Network.  (*Id.* at ¶¶ 23-24).  As Managing Director, Plaintiff was responsible for supervising, both directly and indirectly, ANet's partnerships with approximately 30 in-network schools.  (*Id.* at ¶¶ 25-26, 28).

As ANet continued to grow throughout 2015 and 2016, its state-specific network system evolved into a system of regional networks.  (Def. 56.1 ¶¶ 31-32).  As part of this restructuring, in Spring 2016, the NJ-NY Network expanded and was reorganized into the Mid-Atlantic Region.  (*Id.* at ¶ 33).  Both Plaintiff's and Martin's titles changed, with Plaintiff becoming Managing Director of the Mid-Atlantic Region, and Martin becoming Vice President of the Mid-Atlantic Region.  (*Id.* at ¶¶ 34-35).

Martin was responsible for Plaintiff's annual performance reviews, which were conducted each June at the end of ANet's fiscal year. (Def. 56.1 ¶¶ 37,

39, 41).  In July 2016, Martin drafted and delivered Plaintiff's 2016 performance review, rating her overall performance for the 2015-2016 fiscal year as "Meeting Expectations."  (*Id.* at ¶ 41).  Martin noted that "communication and relationship building may be an opportunity for development" for Plaintiff.  (*Id.* at ¶¶ 44-45).

In or around the fall of 2016, Plaintiff and Martin discussed that, with the expansion of the Mid-Atlantic Region, the work had become too much for them to manage without additional help.  (Def. 56.1 ¶ 48).  Martin began interviewing candidates for a Managing Director position for the Mid-Atlantic Region.  (*Id.*).  Martin expected that the additional Managing Director would take on responsibilities for ANet's partnerships with certain schools in the region.  (*Id.* at ¶ 53).  On November 21, 2016, ANet offered Gwendolyn Stephens the position.  (*Id.* at ¶ 50).  Though Martin had met Stephens professionally prior to her hiring (*id.* at ¶ 49), Plaintiff was also involved in the hiring decision (*id.* at ¶ 51).  In particular, Plaintiff participated in Stephens's interview and was a member of the selection committee.  (*Id.*).  Stephens began working at ANet on January 3, 2017.  (*Id.* at ¶ 50).

### 4. Plaintiff's Illness, First Leave of Absence, and Denial of FMLA Leave

On December 15, 2016, Plaintiff was diagnosed with Stage IIB breast cancer.  (Def. 56.1 ¶ 58).  Plaintiff called Martin to inform her of the diagnosis and to explain that she would not be able to lead a scheduled meeting with a partner school later that week.  (*Id.* at ¶¶ 54, 58).  In response, Martin told Plaintiff to do what she needed to take care of herself, and asked that Plaintiff

call her back in two hours to walk her through the meeting materials so that Martin could lead the meeting in Plaintiff's absence. (*Id.* at ¶ 59). Plaintiff called Martin later that day, walked her through the presentation, and created a plan of action for the meeting. (*Id.* at ¶ 60).

Plaintiff sought information about the availability of medical leave at ANet, as the recommended treatment for her illness included chemotherapy, followed by a double mastectomy and radiation treatments. (Def. 56.1 ¶¶ 61, 64). On December 19, 2016, Plaintiff emailed ANet's Human Resources Manager to request information about the availability of leave under the FMLA. (*Id.* at ¶ 61). Plaintiff explained that she might need to take medical leave as she would be undergoing surgery the following month. (*Id.*). That week, Plaintiff spoke with the Human Resources Manager to discuss ANet's policies regarding leave, the process for requesting FMLA leave, the required paperwork that Plaintiff needed to complete, and Plaintiff's options, which included the decision to take intermittent or continuous leave. (*Id.* at ¶ 62).

On January 25, 2017, the week before beginning her first chemotherapy treatment, Plaintiff commenced a leave of absence that was expected to last through February 24, 2017. (Def. 56.1 ¶¶ 66, 75). Plaintiff's treatment plan involved chemotherapy treatments every three weeks over a 21-week period. (*Id.* at ¶¶ 63-64). Plaintiff hoped to return to work between chemotherapy treatments and to take intermittent leave throughout the duration of her treatments. (*Id.*). However, because Plaintiff's ability to return to work was dependent on her reaction to the chemotherapy, there was no certainty as to

whether or when Plaintiff would return to work.  (*Id.* at ¶ 65).  Prior to Plaintiff's

leave, Martin worked with her to develop a 21-week workplan (the "21-Week

Plan") for Plaintiff's 21 weeks of chemotherapy treatment.  (*Id.* at ¶¶ 67-68).

Under the 21-Week Plan, Plaintiff anticipated that she would only work on

certain days during the week, and that on those days, she would work remotely

from home.  (*Id.* at ¶ 69).  During this time, Martin and Stephens both covered

Plaintiff's workload, including handling check-ins with those coaches Plaintiff

supervised.  (*Id.* at ¶ 91).

On January 27, 2017, Plaintiff received leave paperwork from Insperity

stating that she was not eligible for FMLA leave under ANet's policy because

she did "not work and/or report to a site with 50 or employee [*sic*] employees

within 75 miles." (Def. 56.1 ¶¶ 71-72).[2]  The paperwork encouraged Plaintiff to

contact Insperity if their understanding of her eligibility was incorrect, or if

Plaintiff had any questions.  (*Id.* at ¶ 73).  Plaintiff did not raise any questions

about the letter to either ANet or Insperity.  (*Id.* at ¶ 74; Pl. Dep. 172:2-25).

Plaintiff received an additional letter from Insperity on February 16, 2017,

enclosing a revised copy of her leave information.  (Def. 56.1 ¶ 87).  The

paperwork appended to the letter reiterated that Plaintiff's leave had been

designated a non-FMLA Leave of Absence, as Plaintiff did not work and/or

---

[2]     The Court understands that this determination was based on the fact that ANet's New
York City office, where Plaintiff was employed, never had more than 40 employees
throughout Plaintiff's employment.  (Def. 56.1 ¶ 18).  Further, the closest offices to
ANet's New York City office were its Washington D.C. and Boston offices, both of which
were more than 75 miles away from ANet's New York City office.  (*Id.*).

report to a work site with 50 or more employees within 75 miles. (*Id.* at ¶¶ 87-89).

Plaintiff's intermittent leave was converted to continuous leave in February 2017, during her first round of chemotherapy treatment, upon Plaintiff's submission of paperwork from her medical provider indicating that she would require such leave until the completion of her treatment. (Def. 56.1 ¶¶ 76-80). Plaintiff also requested additional time to recover from her first chemotherapy treatment and an extension of her leave of absence from February 24, 2017, through March 6, 2017. (*Id.* at ¶ 81). ANet granted both requests. (*Id.* at ¶ 82). Given the change in Plaintiff's anticipated return date, Martin requested that Plaintiff update the 21-Week Plan to provide her "best estimate of timing." (*Id.* at ¶¶ 83-84). Plaintiff confirmed that, though she had some uncertainty about her return date, Martin could revise the 21-Week Plan to indicate that Plaintiff would return to work on a remote basis during the week of March 6, 2017. (*Id.* at ¶¶ 85-86).

Plaintiff underwent her second round of chemotherapy on February 21, 2017, and was later hospitalized due to the physical toll of the treatment. (Def. 56.1 ¶¶ 92-93). On March 3, 2017, Plaintiff and Martin spoke by phone to discuss Plaintiff's return to work, and Plaintiff expressed that she still intended to return to work intermittently beginning on March 6, 2017. (*Id.* at ¶ 101). During their call, Martin encouraged Plaintiff to take the time she needed to heal. (*Id.*). Plaintiff later told ANet's Human Resources Manager that Martin

had "indicated" that Plaintiff's intermittent leave would be "disruptive to the team." (*Id.* at ¶ 103).[3]

### 5.    Plaintiff's March 2017 Return to Work and Second Leave of Absence

Plaintiff returned to work on a remote and intermittent basis on March 7, 2017. (Def. 56.1 ¶ 102). Prior to her return to work, Plaintiff provided ANet with a note from her medical provider requesting limitations on her travel due to her treatment regime. (*Id.* at ¶¶ 107-08). ANet granted Plaintiff's request for an accommodation to limit her travel when she returned to work and permitted her to work remotely from home. (*Id.* at ¶ 109).

To prepare for Plaintiff's return, Martin converted the original 21-Week Plan to an 18-week workplan (the "18-Week Plan"). (Def. 56.1 ¶ 111). The 18-Week Plan included a workflow for ANet's Mid-Atlantic Region, to provide clarity on redistribution, redeployment, and reallocation of responsibilities during Plaintiff's intermittent leave. (*Id.* at ¶ 113). Prior to going on leave, Plaintiff had served in a management role for certain school districts in the region, was responsible for all district level-interactions within a certain district, and had sole responsibility for supervising six coaches and conducting their check-ins, among other things. (*Id.* at ¶¶ 118-19, 122). Under the 18-Week Plan, to account for Plaintiff's intermittent schedule and need for reduced

---

[3]      Martin does not recall making this statement to Plaintiff, but has acknowledged that she did feel that Plaintiff's leave was disruptive, and that Plaintiff may have drawn this inference based on the context of their conversation. (*See* Def. 56.1 ¶¶ 104, 247).

travel, those responsibilities were redistributed to other employees, and Plaintiff was designated to "consult" with or assist those employees.  (*Id.* at ¶¶ 118-23).  Plaintiff's responsibilities were limited to work that she could perform remotely over videoconferencing platforms, rather than work that required going "into the field."  (*Id.* at ¶ 143).  Specifically, Plaintiff was responsible for conducting bi-weekly check-ins of four coaches, while Stephens and Martin were designated to assist Plaintiff with those coaches' monthly check-ins.  (*Id.* at ¶¶ 122-23).  Plaintiff was also responsible for preparing and facilitating informal weekly assessments for the four coaches, which she would do remotely with Stephens's and Martin's assistance.  (*Id.* at ¶¶ 124-27).

Two weeks after Plaintiff's return to work, Plaintiff had a telephonic meeting with Martin and Defendant Spooner, ANet's Chief Talent and Equity Officer, to establish a support plan for Plaintiff while she worked remotely. (Def. 56.1 ¶¶ 132, 139).  In advance of the meeting, Martin provided Plaintiff with a document titled "Sharon Wells MD Expectation Adjustments Feb-June 2017" (the "Expectation Adjustments"), which outlined Plaintiff's original responsibilities, adjustments to her responsibilities that would be implemented during her intermittent leave, and her end-of-year goals.  (*Id.* at ¶ 133).  The document provided that Plaintiff would be evaluated based upon these adjustments, given that her responsibilities and work hours had changed. (*Id.*).

At the meeting with Martin and Spooner, Plaintiff raised several questions and concerns regarding the 18-Week Plan and the Expectation

Adjustments, and requested several modifications to her responsibilities. (Def. 56.1 ¶¶ 139-45).[4] Most notably, Plaintiff requested that ANet temporarily reassign her to a limited support role in which she could transcribe videos of coach interactions and work with coaches to develop presentations. (*Id.* at ¶ 144). However, ANet already had a team of administrative employees assigned to video transcription, and individual coaches were responsible for developing their own presentations. (*Id.* at ¶ 145). Further, those tasks were not part of Plaintiff's responsibilities as Managing Director. (*Id.*). As such, Spooner and Martin listened to and considered Plaintiff's requests, but did not further modify the 18-Week Plan or Expectation Adjustments, given that Plaintiff's requests were not medically-based, and there was no available support role to which they could temporarily transfer Plaintiff that met her specifications. (*Id.* at ¶ 147).

Plaintiff, Spooner and Martin had a second call the next day, where Plaintiff expressed that she would prefer to resume her continuous leave rather than accept ANet's accommodations. (Def. 56.1 ¶¶ 148-49). Spooner subsequently emailed Plaintiff to provide her with instructions for resuming continuous leave. (*Id.* at ¶ 150). Plaintiff coordinated with ANet's General Counsel to submit the required forms from her medical provider confirming her need for such leave. (*Id.* at ¶¶ 151-54). Upon receipt of those forms, ANet

---

[4]     Plaintiff has acknowledged that these requested accommodations were not medically necessary, and that none of the requests was related to her medical condition. (Def. 56.1 ¶ 146).

granted Plaintiff's request for continuous leave from April 3, 2017, through September 4, 2017.  (*Id.* at ¶¶ 154-55).

### 6.   Plaintiff's June 2017 Return to Work, 2017 Annual Review, and Third Leave of Absence

In May 2017, Plaintiff finished her sixth and final chemotherapy treatment.  (Def. 56.1 ¶ 156).  On May 31, 2017, she contacted ANet's Human Resources Manager to indicate that she was considering returning to work while she waited to schedule a double mastectomy surgery.  (*Id.* at ¶ 157). Plaintiff indicated that returning to work would prevent the loss of her health insurance benefits, which she understood would occur if she remained on continuous leave.  (*Id.*).  Upon receipt of a note from Plaintiff's doctor on June 8, 2017, ANet granted Plaintiff's request to return on an intermittent and remote basis, with the understanding that she would resume her continuous leave when her surgery was scheduled.  (*Id.* at ¶¶ 159-60).

Martin was scheduled to conduct Plaintiff's annual performance assessment at the end of June, but it was converted to an informal discussion given that Plaintiff had been on leave for approximately half of the evaluation period.  (Def. 56.1 ¶¶ 37, 163).  A Human Resources representative was also in attendance at the assessment.  (*Id.* at ¶ 163).  As in Plaintiff's 2015-2016 assessment, she was again encouraged to improve in relationship-building and conflict resolution.  (*Id.* at ¶ 166).  During the meeting, Martin also informed Plaintiff that ANet was again reorganizing, and that when she returned to work full-time, she would be elevated to the role of Executive Director of the Mid-Atlantic Region.  (*Id.* at ¶ 167).  In this role, Plaintiff would oversee ANet's

Upstate New York Region, including its partnership with the Syracuse School District, while Stephens — who was also being elevated to an Executive Director position — would oversee the New York City and New Jersey Regions. (*Id.* at ¶ 168).  Martin explained that the assignments took into consideration that Plaintiff had been working with coaches in Syracuse since the beginning of her employment with ANet, and that Stephens, who had no relationship with the coaches or districts in Upstate New York, had taken on the responsibility of overseeing coaches in New York and New Jersey during Plaintiff's leave.  (*Id.* at ¶¶ 169-73).  Martin indicated that she would discuss the details of Plaintiff's new role when Plaintiff returned from her surgery.  (*Id.* at ¶ 174).

On July 5, 2017, Plaintiff went on continuous leave to undergo a double mastectomy surgery.  (Def. 56.1 ¶ 175).  ANet granted Plaintiff's initial leave request through September 30, 2017, and subsequently extended her leave through December 1, 2017, at Plaintiff's request.  (*Id.* at ¶¶ 175-76).

### 7.  Plaintiff's November 2017 Return to Work and EEOC Complaint

On November 27, 2017, Plaintiff returned to work with her doctor's authorization, and with ANet's agreement to limit her air travel.  (Def. 56.1 ¶ 177).  As Plaintiff returned to work the day ANet had scheduled a retreat in Washington, D.C., Martin invited Plaintiff to either travel to the retreat or attend virtually.  (*Id.* at ¶ 179).  Plaintiff elected to attend in person.  (*Id.* at ¶ 180).  During a "breakout session" held at the retreat, Martin asked Plaintiff for her "vision" for the Upstate New York Region.  (*Id.* at ¶ 181).  Plaintiff responded that she did not have a vision, and wanted to build from Martin's

vision for the region.  (*Id.*).  Plaintiff later told Defendant Cockrell, ANet's Chief Network Officer, that she perceived Martin's body language during this discussion as "aggressive.  (*Id.* at ¶¶ 302-03).  She has alleged that Cockrell "belittl[ed"] her in response.  (Compl. ¶ 100).

On November 30, 2017, Martin provided Plaintiff with a re-entry plan for her return, which outlined Plaintiff's role, responsibilities, and goals as Executive Director.  (Def. 56.1 ¶ 182).  The re-entry plan emphasized that in this new role, Plaintiff was expected to focus on developing a growth strategy for the Upstate New York Region.  (*Id.*).  Beginning in December, Martin and Plaintiff met on a weekly basis to discuss developing and supporting the Upstate New York Region.  (*Id.* at ¶¶ 184, 290).

On December 29, 2017, Plaintiff filed an administrative Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (the "EEOC") alleging claims of disability discrimination and retaliation against ANet.  (Def. 56.1 ¶ 224).  The Charge of Discrimination was not issued or otherwise communicated to ANet at the time.  (*Id.* at ¶ 226).  On April 27, 2018, the EEOC issued Plaintiff a Notice of Right to Sue.  (*Id.* at ¶ 225).  ANet was not made aware of Plaintiff's Charge of Discrimination until May 1, 2018, when it was mailed to them by the EEOC.  (*Id.* at ¶ 227).

### 8.   ANet's 2018 Reorganization and Plaintiff's Termination

In February 2018, the Syracuse School District experienced a $24 million budget deficit.  (Def. 56.1 ¶ 189).  In March 2018, ANet learned that district's proposal for its 2018-2019 school year was $100,000 less than the prior year,

and reduced the number of ANet's partnership schools.  (*Id.* at ¶ 191).  Given the budget deficit, ANet's partnership with the district began shrinking.  (*Id.* at ¶ 192).  The same month, as part of a number of structural changes, ANet divided its Mid-Atlantic Region into "Metro-NY" and "Washington, D.C./Maryland" Regions.  (*Id.* at ¶ 195).  ANet's Upstate New York Region, which had previously been part of the Mid-Atlantic Region, was absorbed into ANet's New England Region, meaning ANet's partnership with the Syracuse School District would now be managed out of ANet's office in western New England.  (*Id.* at ¶ 196).[5]

On April 11 and 17, 2018, Cockrell met with Plaintiff to discuss the reorganization of the Mid-Atlantic Region, as well as the possibility that ANet might eliminate her role.  (Def. 56.1 ¶¶ 197-200).  Cockrell explained that for ANet to maintain Plaintiff's Executive Director position, Plaintiff would be required to develop growth in other districts, to make up for the shortfall caused by the Syracuse School District's budgetary issues.  (*Id.* at ¶¶ 197-98, 200).  During their meetings, Cockrell asked Plaintiff whether she was willing to take on these changes to her role, or if there was a different position she wanted to explore.  (*Id.* at ¶¶ 199-200).  Cockrell and Plaintiff subsequently exchanged emails regarding the potential elimination of Plaintiff's position, as well as Plaintiff's views on Cockrell's proposed changes to her role.  (*Id.* at ¶¶ 201-06).  Plaintiff initially indicated she was open to developing ANet's

---

[5]     ANet also made personnel changes as part of this reorganization, with Martin accepting the role of Vice President of the newly-formed West Region.  (Def. 56.1 ¶¶ 193-94).

Upstate New York Region, but that she would need a "blueprint" she could follow. (*Id.* at ¶ 202).  Cockrell's view was that Plaintiff should not require a blueprint, given that she had been responsible for the Upstate New York Region for the prior five years.  (*Id.* at ¶¶ 203-04).  Cockrell and Plaintiff also discussed alternative roles Plaintiff could apply for at ANet, but Plaintiff did not identify any roles for which she felt well-suited.  (*Id.* at ¶ 206).

Between April 23, 2018 and May 1, 2018, Cockrell informed Plaintiff that her role would be eliminated as of June 30, 2018. (Def. 56.1 ¶ 207).[6]  ANet was unaware of Plaintiff's allegations of discrimination and the fact that Plaintiff had filed a Charge of Discrimination at the time that Cockrell decided to eliminate her role.  (*Id.* at ¶ 228).  On May 1, 2018, Plaintiff emailed Cockrell stating she understood the decision, and hoped another position would open up given ANet's ongoing reorganization.  (*Id.* at ¶ 208).  Cockrell continued to discuss alternative positions with Plaintiff, and encouraged her to apply for other roles, including a Managing Director position on another team.  (*Id.* at ¶¶ 209-13, 222).  Though Plaintiff has indicated that she declined to apply for certain of the roles suggested by Cockrell because they would have involved working with Martin, Defendants represent that such interaction would not have been a requirement of the positions.  (*Id.* at ¶¶ 216-17).  An ANet Human Resources representative also emailed Plaintiff on several occasions throughout

---

[6]     As part of ANet's reorganization, 18 roles were eliminated between 2017 and 2018. (Def. 56.1 ¶ 285).  To date, the roles of all employees assigned to the Upstate New York Region have been eliminated, though some of the employees applied for other open positions and remain employed by ANet.  (*Id.* at ¶¶ 288-89).

May 2018 to identify possible positions for Plaintiff, and highlighted three positions for which Plaintiff may have been eligible.  (*Id.* at ¶¶ 218-19). However, as of June 29, 2018, Plaintiff had not applied for any positions within ANet, and her role as Executive Director was eliminated.  (*Id.* at ¶ 223).

## B.   Procedural History

Plaintiff commenced this action with the filing of her Complaint on July 22, 2018, asserting claims under the FMLA, the ADA, the NYSHRL, and the NYCHRL for interference with her FMLA rights, failure to accommodate, discrimination, and retaliation.  (Dkt. #1).  On September 21, 2018, Defendants filed their Answer to the Complaint (Dkt. #25), and this action was thereafter referred to mediation (Dkt. #26).  After an unsuccessful mediation, the parties filed a proposed Case Management Plan on December 18, 2018, which the Court subsequently endorsed.  (Dkt. #32, 35).

Following a protracted discovery period (Dkt. #37-44, 51-59), Defendants requested leave to move for summary judgment (Dkt. #58).  The Court granted such leave and set a briefing schedule on Defendants' motion (Minute Entry for February 12, 2020), and subsequently extended the briefing schedule at the parties' request (Dkt. #62).  On May 4, 2020, Defendants filed their motion for summary judgment, as well as accompanying memorandum, Local Rule 56.1 Statement, and declarations.  (Dkt. #65-71).  On May 19, 2020, Plaintiff applied for an extension of time to file her opposition to Defendants' motion, which the Court granted.  (Dkt. #72, 73).  Pursuant to the Court's extension, Plaintiff's opposition was due on or before June 22, 2020.  (*See* Dkt. #73).

17

However, Plaintiff did not submit an opposition, leaving Defendants' motion unopposed.  The motion is now ripe for review.

## DISCUSSION

**A.    Applicable Law**

### 1.    Unopposed Summary Judgment Motions Under Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[7]  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.,* 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted).  A fact is "material" if it "might affect the outcome of the suit under the governing law[.]"  *Anderson*, 477 U.S. at 248.  "In assessing the record to determine whether there is a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Gorzynski* v.

---

[7]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refers to "genuine issues of material fact."

*JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986*); see also Brown* v. *Henderson*, 257 F.3d 246. 252 (2d Cir. 2001).  Rather, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  In considering "what may reasonably be inferred" from evidence in the record, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).  Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory

statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587; *Wyler* v. *United States*, 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010). It should also be noted that "the principles governing admissibility of evidence do not change on a motion for summary judgment. … [O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Presbyterian Church of Sudan* v. *Talisman Energy*, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Raskin* v. *Wyatt Co.*, 125 F.3d 55, 65-66 (2d Cir. 1997)).

The Second Circuit has made clear that "the opponent to such a motion is free to ignore it completely, thereby risking the admission of key facts and leaving it to the court to determine the legal merits of all claims or defenses on those admitted facts[.]" *Jackson* v. *Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014). However, on such unopposed motions, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Id.* at 194. "Even when unopposed, a motion for summary judgment should be granted only when the moving party has met its burden of establishing no genuine dispute of material fact and its entitlement to judgment as a matter of law." *Levitant* v. *City of New York Human Res. Admin.*, 558 F. App'x 26, 30 (2d Cir. 2014) (summary order)

(citing *Vt. Teddy Bear Co.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)).

The Second Circuit has emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where ... the merits turn on a dispute as to the employer's intent." *Lyman* v. *New York & Presbyterian Hosp.*, No. 11 Civ. 3889 (KPF), 2014 WL 3417394, at *7 (S.D.N.Y. July 14, 2014) (citing *Gorzynski*, 596 F.3d at 101 (internal quotation marks and citation omitted)). "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.* (citing *Schwapp* v. *Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks and citations omitted)).

### 2.   The FMLA

Under the FMLA, eligible employees are "entitled" to twelve weeks of unpaid leave per year. 29 U.S.C. § 2612(a)(1). A "serious health condition" is one ground for FMLA leave, *id.* § 2612(a)(1)(D), and such leave "may be taken intermittently or on a reduced leave schedule when medically necessary" *id.* § 2612(b)(1). It is unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. *Id.* § 2615(a)(1); *see also Blodgett* v. *22 S. St. Operations, LLC*, 828 F. App'x 1, 4 (2d Cir. 2020) (summary order).

"FMLA claims come in at least two varieties: interference and retaliation." *Woods* v. *START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir.

2017).  "[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA."  *Id.*  And an employee may bring a retaliation claim based on "actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer."  *Id.*

### 3.     Employment Discrimination Under the ADA, the NYSHRL, and the NYCHRL

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... discharge of employees[.]"  42 U.S.C. § 12112(a).  Discrimination under the ADA includes the failure to make "reasonable accommodations to the known physical ... limitations" of an otherwise qualified employee, unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business[.]"  42 U.S.C. § 12112(b)(5)(A); *see also Brady* v. *Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).  The NYSHRL provides that "[i]t shall be an unlawful discriminatory practice ... [f]or an employer ... because of an individual's ... disability ... to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a). Under the NYSHRL, it is unlawful for any employer to fail to provide reasonable accommodations for known disabilities of their employees.  *Id.* § 296(3)(a).

Discrimination, failure to accommodate,[8] and retaliation claims under the ADA and the NYSHRL are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802-04 (1973).  *See Widomski* v. *State Univ. of N.Y. (SUNY) at Orange*, 748 F.3d 471, 476 (2d Cir. 2014); *see also Snowden* v. *Trustees of Columbia Univ.*, 612 F. App'x 7, 8 (2d Cir. 2015) (summary order); *Zann Kwan* v. *Andalex Group LLC*, 737 F.3d 834, 843-44 (2d Cir. 2013).[9]  Under this framework,

> the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so ... the defendant [must] articulate some legitimate, nondiscriminatory reason for its action.  If such a reason is provided, plaintiff ... may still prevail by showing ... that the employer's determination was in fact the result of [discrimination].

*Holcomb* v. *Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citations omitted).

### a.    Discrimination and Retaliation Claims

To establish a *prima facie* case of discrimination under the ADA or the NYSHRL, a plaintiff must show: (i) that her employer is subject to the statute;

---

[8]    The Court acknowledges that some courts in this District have found that applying the *McDonnell-Douglas* test to a failure to accommodate claim is "not helpful and could introduce unwarranted intent requirements into the analysis."  *Nazario* v. *Promed Personnel Servs. NY Inc.*, No. 15 Civ. 6989 (LGS), 2017 WL 2664202, at *5 n.1 (S.D.N.Y. June 19, 2017).

[9]    The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which is to render the standard for claims closer to the standard under the NYCHRL.  *See* A8421/S6577 (as amended by S6594/A8424).  These amendments were signed into law by Governor Andrew Cuomo on or about August 12, 2019.  Significantly, however, these amendments only apply to claims that accrue on or after the effective date of October 11, 2019; they do not apply retroactively to Plaintiff's claims here.  *See Wellner* v. *Montefiore Med. Ctr.*, No. 17 Civ. 3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019).

(ii) that she is disabled within the meaning of the statute or perceived to be so by her employer; (iii) that she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (iv) that she suffered an adverse employment action because of her disability. *See Jacques* v. *DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004); s*ee also Nelson* v. *City of New York*, No. 11 Civ. 2732 (JPO), 2013 WL 4437224, at *6 (S.D.N.Y. Aug. 19, 2013) (applying this test to claims under the NYSHRL).  To establish retaliation, the *prima facie* case is similar insofar as a plaintiff must demonstrate that: "[i] she engaged in protected activity, [ii] the employer was aware of this activity, [iii] she was subjected to an adverse employment action against her, and [iv] a causal connection existed between the alleged adverse employment action and her protected activity." *McGuire-Welch* v. *House of the Good Shepherd*, 720 F. App'x 58, 62 (2d Cir. 2018) (summary order) (citing *Weixel* v. *Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002)).

An adverse employment action is defined as one that is "materially adverse with respect to the terms and conditions of employment," and it includes termination.  *Flieger* v. *Eastern Suffolk BOCES*, 693 F. App'x 14, 17 (2d Cir. 2017) (summary order) (quoting *Davis* v. *N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (per curiam)).  Protected activities include requests for reasonable accommodations.  *Weixel*, 287 F.3d at 149.  Causation can be shown through indirect proof "that the protected activity was closely followed in time by the adverse action." *Clark* v. *Jewish Childcare Ass'n, Inc.*,

96 F. Supp. 3d 237, 262 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).

Once a plaintiff establishes a *prima facie* case of discrimination or retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision.  *See Treglia* v. *Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  "If ... the defendant ... points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  *Cifra* v. *G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

### b.    Failure to Accommodate Claims

To establish a *prima facie* case of discrimination for failure to provide a reasonable accommodation under the ADA or the NYSHRL, a plaintiff must demonstrate that "[i] [she has] a disability under the meaning of the ADA; [ii] [the defendant, an entity covered by the ADA] had notice of [her] disability; [iii] with reasonable accommodation, [she] could perform the essential functions of the job at issue; and [iv] the [covered entity] has refused to make such accommodations."  *McMillan* v. *City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013); *see also Noll* v. *Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015).  "A reasonable accommodation is one which permits an employee with a disability to perform in a reasonable manner the activities involved in the job and does not impose an undue hardship on the employer's business."  *Vangas*

25

v. *Montefiore Med. Ctr.*, 823 F.3d 174, 180 (2d Cir. 2016) (internal quotation marks omitted).

Although "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder," where an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Noll*, 787 F.3d at 94 (quoting *Wernick* v. *Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996)). If the proposed accommodation is "plainly reasonable," then "[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable." *Id.* "An employer is "not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Id.* at 95. Rather, "[t]he hallmark of a reasonable accommodation is effectiveness." *Dean* v. *Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015).

### c. The NYCHRL

Claims brought under the NYCHRL must be reviewed "independently from and 'more liberally' than their federal and state counterparts." *Loeffler* v. *Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams* v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)); *see generally Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (noting that courts must "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably

possible'" (quoting *Albunio* v. *City of New York*, 16 N.Y.3d 472, 477-78 (2011))).

Under the NYCHRL, a plaintiff is not required to show an adverse employment

action and need only "show differential treatment — that she is treated 'less

well' — because of a discriminatory intent."  *Mihalik*, 715 F.3d at 110.  "Though

the NYCHRL has more liberal standards than do its federal and state

counterparts, courts in the Second Circuit typically 'appl[y] [the] liberal

standards [of the NYCHRL] to the basic *McDonnell Douglas* framework.'"

*Alexander* v. *N.Y.C. Dep't of Educ.*, No. 19 Civ. 7023 (AJN), 2020 WL 7027509,

at *3 (S.D.N.Y. Nov. 30, 2020) (quoting *Farzan* v. *Wells Fargo Bank, N.A.*, No. 12

Civ. 1217 (RJS) (JLC), 2013 WL 6231615, at *15 (S.D.N.Y. Dec. 2, 2013)).

## B.   Analysis

Plaintiff elected not to oppose Defendants' summary judgment motion.

As such, the Court views Defendants' motion as unopposed and all statements

of fact in Defendants' Rule 56.1 submission as admitted.  *See Balderas* v.

*Barmadon Mgmt. LLC*, No. 17 Civ. 7489 (GHW), 2019 WL 1258921, at *1

(S.D.N.Y. Mar. 19, 2019).  However, the Court must nonetheless determine

whether Defendants have "met [their] burden of establishing no genuine

dispute of material fact and [their] entitlement to judgment as a matter of law."

*Levitant*, 558 F. App'x at 30.

Defendants have moved for summary judgment on Plaintiff's claims brought under the FMLA, the ADA, the NYSHRL, and the NYCHRL.  The Court will consider each in turn.[10]

### 1.   The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's FMLA Claims

The Court begins with Plaintiff's FMLA claims.  Plaintiff has alleged both interference with her FMLA rights, as well as retaliation for the exercise of her FMLA rights.  (Compl. ¶¶ 134-39).  Defendants have moved for summary judgment on the grounds that Plaintiff was not eligible for FMLA leave, and thus cannot establish either claim.  (Def. Br. 11-12).  Defendants also address the merits, arguing that they did not interfere with any of Plaintiff's FMLA-protected rights and did not engage in any retaliatory conduct.  (*Id.* at 12-18).

### a.   FMLA Interference

Plaintiff alleges that Defendants interfered with her exercise of rights protected under the FMLA by, *inter alia*, restraining and denying her ability to work under her FMLA leave.  (Compl. ¶¶ 43, 45, 47, 134-36).  Defendants argue that a threshold matter, Plaintiff has not established her FMLA eligibility and, further, that Plaintiff made her own decisions regarding leave in consultation with her medical provider.  (Def. Br. 11-12).

---

[10]   At the outset, the Court grants the Individual Defendants summary judgment on Plaintiff's ADA discrimination, failure to accommodate and retaliation claims. Defendants correctly observe that the ADA does not provide for individual liability.  (Def. Br. 18 n.1).  And a number of courts in this Circuit have held that there is no cause of action against a supervisor for violations of the ADA.  *See Gomez* v. *N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 302-03 (S.D.N.Y. 2016); *Lane* v. *Maryhaven Ctr. of Hope*, 944 F. Supp. 158, 161-62 (E.D.N.Y. 1996) (collecting cases).  Thus, the Court will proceed to consider Plaintiff's ADA claims as to ANet, rather than as to the Individual Defendants.

To succeed on a claim of FMLA interference, a plaintiff is required to plead: "[i] that she is an eligible employee under the FMLA; [ii] that defendant is an employer as defined by the FMLA; [iii] that she was entitled to leave under the FMLA; [iv] that she gave notice to the defendant of her intention to take leave; and [v] that she was denied benefits to which she was entitled under the FMLA." *Ziccarelli* v. *N.Y. Univ. Hosps. Ctr.*, 247 F. Supp. 3d 438, 447 (S.D.N.Y. 2017) (quoting *Geromanos* v. *Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004)).

Throughout her Complaint, Plaintiff presupposes the dispositive issue of whether she was an "eligible employee" under the FMLA. (*See, e.g.*, Compl. ¶ 11 (stating that Plaintiff was an "eligible employee" within the meaning of the FMLA at all relevant times)). A threshold issue for an interference claim under the FMLA is "whether an employee is eligible under the statute to claim its protections." *Arroyo-Horne* v. *City of New York*, 831 F. App'x 536, 539 (2d Cir. 2020) (summary order). And the FMLA excludes from its definition of eligible employees "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii).

Defendants' administrator of its leave process, Insperity, determined that Plaintiff was not eligible for FMLA leave based on this statutory exclusion. (Def. Br. 12; Def. 56.1 ¶¶ 71-72, 87-89). The record evidence submitted by Defendants supports this determination. (*See* Def. 56.1 ¶¶ 18, 236-38).

Specifically, during the relevant period, ANet's New York City office did not employ more than 40 employees.  (*Id.* at ¶ 18).  Further, the ANet offices closest to its New York City office were more than 75 miles away.  (*Id.*).  Defendants submit that Plaintiff was twice informed by Insperity that she was not covered by the FMLA because she worked at a site with fewer than 50 employees in a 75-mile radius.  (Def. Br. 12).

Plaintiff failed to challenge Insperity's determination as to her eligibility, and has since put forth no evidence demonstrating that she was an "eligible employee" under the FMLA.[11]  As such, Plaintiff cannot prevail on a claim of interference with her FMLA rights as a matter of law.  *See, e.g.*, *Watkins* v. *First Student, Inc.*, No. 17 Civ. 1519 (CS), 2018 WL 1135480, at *12 (S.D.N.Y. Feb. 28, 2018) (finding that plaintiff could not "sustain an FMLA interference action" because, among other things, "she had not alleged any facts indicating that she was an eligible employee"); *Anderson* v. *N.Y.C. Health & Hosps. (Coney Island Hosp.)*, No. 18 Civ. 3056 (BMC) (LB), 2019 WL 1765221, at *3 (E.D.N.Y. Apr. 22, 2019) (holding plaintiff failed to state a claim for FMLA interference or retaliation under the FMLA because plaintiff did not allege facts showing that she was eligible for FMLA benefits); *Diby* v. *Kepco Inc.*, No. 16 Civ. 583 (KAM) (LB), 2016 WL 5879595, at *3-4 (E.D.N.Y. Oct. 7, 2016) (dismissing FMLA

---

[11]     Though Plaintiff alleges in her Complaint that she was an "eligible employee" within the meaning of the FMLA, and that ANet "employs more than 50 employees, operating within a 75-mile radius of where Plaintiff worked[]" (Compl. ¶ 11), that allegation has since been refuted by Defendant's unopposed Local Rule 56.1 Statement (*see* Def. 56.1 ¶¶ 18, 236-38).

interference claim for, among other reasons, failure to adequately plead that plaintiff was eligible employee).

Further, the record establishes that Defendants went beyond any requirements of the FMLA, offering Plaintiff 33 weeks of continuous leave, as well as months of intermittent leave. (Def. 56.1 ¶ 250). As such, there is no evidence that Plaintiff was denied any benefits to which she would have been entitled under the FMLA. *See Stuart* v. *T-Mobile USA, Inc.*, No. 14 Civ. 4252 (JMF), 2015 WL 4760184, at *4 (S.D.N.Y. Aug. 12, 2015) (finding "fatal defect" in Plaintiff's FMLA interference claim where employer "approved each and every request for leave that she made"); *see also Sarno* v. *Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161 (2d Cir. 1999) (holding that plaintiff failed to establish an interference claim because he had received the twelve weeks of leave to which he was entitled).

Plaintiff alleges that she was forced to go on continuous leave between March 2017 and June 2017, ostensibly due to the "work environment" created by Defendants. (Compl. ¶ 74). Even were this allegation supported by the record, it would not change the outcome. "[F]orced leave, by itself, does not violate any right provided by the FMLA." *Sista* v. *CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006). Plaintiff must demonstrate that "such a forced leave interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA[.]" *Id.* Plaintiff has not demonstrated any such impingement on any FMLA right. Rather, the evidence reflects that, after Defendants designed a workplan for Plaintiff's return to work in March 2017,

31

and denied Plaintiff's requests for further accommodations that were not based on any medical needs, Plaintiff elected to resume her continuous leave with the approval of her medical provider, and voluntarily returned from such leave in June 2017.  (Def. 56.1 ¶¶ 111, 147-55, 158-60).  As such, there is nothing in the record that suggests that Plaintiff was denied any FMLA benefits to which she was entitled, or that Defendants otherwise interfered with her FMLA rights. Summary judgment is warranted as to Plaintiff's FMLA interference claim.

### b.    FMLA Retaliation

Plaintiff further claims that Defendants retaliated against her for exercising her rights under the FMLA.  (Compl. ¶¶ 137-39).[12]  To establish a *prima facie* case of FMLA retaliation, a plaintiff must establish that: "[i] [she] exercised rights protected under the FMLA; [ii] [she] was qualified for [her] position; [iii] [she] suffered an adverse employment action; and [iv] the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Graziadio* v. *Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016) (citation omitted).  "If the plaintiff makes out a *prima facie* case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual."  *Id.*

---

[12]    In her Complaint, Plaintiff does not distinguish between the alleged retaliatory conduct underlying her FMLA claims and the conduct underlying her other claims of retaliation. And she has testified that the facts underlying her various retaliation claims are "connected" and "intertwined".  (*See* Def. 56.1 ¶ 293).  The Court thus understands Plaintiff's FMLA retaliation claim to be premised upon the same retaliatory conduct alleged in support of her ADA, NYSHRL, and NYCHRL retaliation claims, which conduct is discussed further elsewhere in this Opinion.

32

Though the requirements for establishing *prima facie* cases for FMLA interference and retaliation differ, courts in this Circuit agree that proving entitlement to FMLA leave is a necessary prerequisite to a valid FMLA retaliation claim.  *See Arroyo-Horne*, 831 F. App'x at 539 ("A threshold issue for both FMLA interference claims and FMLA retaliation claims is whether an employee is eligible under the statute to claim its protections."); *see also Kim* v. *Goldberg, Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 318 (S.D.N.Y. 2012) (collecting cases).  As discussed above, Plaintiff cannot prove that she was entitled to FMLA leave because she has not established that she was an eligible employee under the statute.  Thus, her FMLA retaliation claim likewise fails to survive summary judgment.  *See Watkins*, 2018 WL 1135480, at *12 ("Plaintiff's inability to establish that she was entitled to FMLA leave also prevents her from asserting an FMLA retaliation claim."); *see also Duarte* v. *St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 357 (S.D.N.Y. 2017); *Milne* v. *Navigant Consulting*, No. 08 Civ. 8964 (NRB), 2010 WL 4456853, at *10 (S.D.N.Y. Oct. 27, 2010).

Though Plaintiff alleges that Defendants advised her that she was eligible for FMLA, and that she went on intermittent leave based upon this representation, this does not change the Court's assessment of her retaliation claim.  (Compl. ¶¶ 37-38).  To the extent Plaintiff is alleging a theory of equitable estoppel, she has not established detrimental reliance, as required to make out such a claim.  *See Vangas* v. *Montefiore Med. Ctr.*, 925 F. Supp. 2d 574, 579 (S.D.N.Y. 2013) ("'Reliance' means … that [plaintiff] 'must have relied

on [her] adversary's conduct 'in such a manner as to change [her] position for

the worse.'" (quoting *Heckler* v. *Cmty. Health Servs. of Crawford Cnty., Inc.*, 467

U.S. 51, 59 (1984) (alterations in original))).  Plaintiff has not alleged or

otherwise demonstrated that she could have, or would have taken any action

that would have resulted in a better outcome, such as going on continuous

leave, or returning to work before exhausting her leave.  Nor could she, as

Defendants granted every request made by Plaintiff to either commence,

extend, or return from her leave.  (Def. 56.1 ¶¶ 82, 150-55, 159-60, 175-76).

For these reasons, no triable issues exist concerning Plaintiff's *prima facie*

showing of FMLA interference and retaliation, and summary judgment is

granted as these claims.[13]

### 2.   The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Failure to Accommodate Claims

Plaintiff brings failure to accommodate claims under the NYSHRL and

the NYCHRL.  (Compl. ¶¶ 140-46, 152-54).  However, because Plaintiff's

discrimination claims under the ADA, the NYSHRL, and the NYCHRL rely, at

least in part, on Defendants' alleged denial of a reasonable accommodation (*see

id.* ¶¶ 128, 141), the Court will construe Plaintiff's failure to accommodate

claims as brought under the ADA as well.  (Compl. ¶¶ 123-30).  *See Berger* v.

---

[13]   Even had Plaintiff established entitlement to FMLA leave as required for a claim of
FMLA retaliation, she would also need to demonstrate that she suffered an adverse
employment action under circumstances giving rise to an inference of retaliatory intent.
*See Graziadio* v. *Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016).  The Court will
later address, in connection with Plaintiff's retaliation claims brought under the ADA,
the NYSHRL, and the NYCHRL, Defendants' proffered justifications for the adverse
employment actions alleged by Plaintiff.

*N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 369 n.8 (S.D.N.Y. 2018).  The Court will first address Plaintiff's failure to accommodate claims before turning to her broader discrimination claims.

In her Complaint, Plaintiff alleges that Defendants either promised her accommodations that were not implemented, or outright denied her requests for reasonable accommodations.  (*See, e.g.*, Compl. ¶¶ 55, 67).  These claims are focused on Defendants' alleged failures during Plaintiff's initial leave of absence in January 2017, her first return to intermittent work in March 2017, and her subsequent return to full-time work in November 2017.  Defendants argue that the accommodations they provided Plaintiff were reasonable and effective, and that any requested accommodations they did not provide were not medically necessary.  (Def. Br. 19-20).

As stated above, to establish a *prima facie* case of discrimination for failure to provide a reasonable accommodation under the ADA, the NYSHRL or the NYCHRL, a plaintiff must demonstrate that (i) she has a disability under the meaning of the statute; (ii) an employer covered by the statute had notice of her disability; (iii) with reasonable accommodation, she could perform the essential functions of the job at issue; and (iv) the employer has refused to make such accommodations.  *See McMillan*, 711 F.3d at 125-26; *see also Noll*, 787 F.3d at 94; *Lawtone-Bowles* v. *City of New York.*, No. 17 Civ. 8024 (WHP), 2019 WL 652593, at *6 (S.D.N.Y. Feb. 15, 2019) ("Courts apply the same standard for failure to accommodate cases under the ADA … NYSHRL, and NYCHRL."). "A reasonable accommodation is one which permits an employee

with a disability to perform in a reasonable manner the activities involved in the job and does not impose an undue hardship on the employer's business." *Vangas*, 823 F.3d at 180 (internal quotation marks omitted).

Defendants dispute neither that Plaintiff had a disability under the meaning of the ADA, the NYSHRL and the NYCHRL, nor that ANet is an employer covered by those statutes with notice of her disability. The Court's inquiry therefore concerns whether Plaintiff made a sufficient showing that, with reasonable accommodation, she could perform the essential functions of her job, and that Defendants failed to make such accommodations.[14]

"Summary judgment is . . . appropriate where a plaintiff fails to identify a facially reasonable accommodation that the defendant refused to provide . . . or when the employer offers an accommodation that is plainly reasonable." *Howard* v. *United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 352-53 (S.D.N.Y. 2015) (quoting *Gronne* v. *Apple Bank for Sav.*, 1 F. App'x 64, 67 (2d Cir. 2001) (summary order) (internal quotation marks and citations omitted)), *aff'd sub nom. Howard* v. *United Parcel Serv.*, 648 F. App'x 38 (2d Cir. 2016) (summary order). Defendants have established that they are entitled to summary judgment on both of these bases.

As an initial matter, the Court observes that Defendants provided Plaintiff with a number of accommodations. Defendants granted Plaintiff several requested medically-based accommodations, including allowing Plaintiff

---

[14]     The Individual Defendants can also be found liable under the NYSHRL if they contributed to any failure to make reasonable accommodations. *See Diaz* v. *Viagran*, No. 16 Civ. 9106 (CM), 2018 WL 4360790, at *15 (S.D.N.Y. Aug. 29, 2018).

intermittent and continuous leave, and facilitating her requests to work remotely and to limit her travel.  (Def. 56.1 ¶¶ 66, 82, 108-09, 154-55, 159-60, 175-76, 178).  They further redeployed resources to reassign tasks during Plaintiff's intermittent and continuous leave to ensure her needs were met.  (*Id.* at ¶¶ 91, 111-27).  The Court will consider whether these accommodations were plainly reasonable within the meaning of the relevant statutes.

*First*, prior to Plaintiff's first leave of absence, she worked with Martin to create a 21-Week Plan to accommodate Plaintiff's work schedule during her chemotherapy treatments.  (Def. 56.1 ¶¶ 68-69).  The plan took into account Plaintiff's initial request for intermittent leave and anticipated remote-work return date of February 24, 2017.  (*Id.* at ¶ 70).  When Plaintiff subsequently requested to go on continuous leave, with a return date of March 6, 2017, Defendants granted those requests and adjusted the plan, including by reallocating Plaintiff's workload.  (*Id.* at ¶¶ 80-86, 267).  These accommodations were reasonable on their face.  *McMillan*, 711 F.3d at 127 ("Reasonable accommodations may include adjustments to work schedules or other job restructuring." (citation and internal quotation marks omitted)).  And Plaintiff has not suggested that these accommodations were not reasonable, but rather argues that Defendants, particularly Martin, failed to follow the plan during her first leave of absence, including failing to cover Plaintiff's responsibilities during this time.  (Pl. Dep. 233:23-234:9; Compl. ¶ 55).[15]  However, Plaintiff has not

---

[15]    For example, Plaintiff stated that Martin had indicated that "no one" was supporting Plaintiff's team of coaches during her January 2017 to March 2017 leave.  (Pl.

supported these allegations with any evidence demonstrating that Martin or anyone else at ANet in fact failed to cover Plaintiff's responsibilities during this time.  And Defendants have put forth sworn testimony and documentary evidence reflecting that Plaintiff's workload during her first leave of absence *was* covered by Martin and Stephens, with support from the ANet national team.  (Martin Decl. ¶ 33; *see also id.*, Ex. T at 4 (indicating that Stephens had assumed Plaintiff's meeting times with coaches during her absence)).  As such, the Court accepts that the accommodations provided during Plaintiff's initial leave, even if they varied to some extent from the written 21-Week Plan, were reasonable.

*Second*, upon Plaintiff's return from leave in March 2017, Martin converted the 21-Week Plan into the 18-Week Plan to reflect Plaintiff's intermittent work schedule and need for remote work, and to clarify and reduce Plaintiff's responsibilities during the remainder of her chemotherapy treatments.  (Def. 56.1 ¶¶ 110-27).  Shortly after Plaintiff's return to work, she met with Martin and Spooner to discuss the Expectation Adjustments, a support plan for her remote work.  (*Id.* at ¶ 132).  The Expectation Adjustments outlined Plaintiff's original responsibilities, new accommodations, and modifications to Plaintiff's end-of-year goals to reflect those changes.  (*Id.* at ¶¶ 133-34).

---

Dep. 220:7-9, 236:9-12, 280:6-8).  However, Plaintiff has not put forth any evidence demonstrating that her teams in fact went unsupported.

With respect to the 18-Week Plan and the Expectation Adjustments, Plaintiff argues that Defendants should have provided her with additional or different accommodations.  However, ANet's accommodations to Plaintiff appear to have been designed to allow her, to the extent possible, to continue her work supervising, developing, and managing coaches in school districts in Upstate New York.  (Def. 56.1 ¶¶ 25-27, 118).  While this work previously required traveling to schools to observe and provide feedback to coaches, Plaintiff's limitations on travel during her treatment required adjustments to account for her inability to conduct in-person supervision and training.  (*Id.* at ¶¶ 108-10).  As such, Martin assigned team members to assist Plaintiff with her supervisory responsibilities, and contemplated Plaintiff performing some of her responsibilities by video to account for her travel limitations.  (*Id.* at ¶¶ 119, 123-27).  Plaintiff appears to accept that she was unable to carry out her supervisory responsibilities remotely, and to agree that neither the 18-Week Plan nor the Expectation Adjustments contained tasks that she was medically unable to perform.  (*Id.* at ¶ 146; Pl. Dep. 258:25-259:3).

The Court concludes on the record before it that because Defendants provided Plaintiff with numerous accommodations to address her medical needs and intermittent work schedule, while enabling Plaintiff to carry out the essential functions of her job, their accommodations were reasonable as a matter of law.  *See Howard*, 101 F. Supp. 3d at 355-56 (finding that accommodations were reasonable where employer made "numerous modifications" to allow employee to perform job functions).  With this finding,

the Court is permitted to end its inquiry into Plaintiff's federal and state failure to accommodate claims. *See Berger*, 304 F. Supp. 3d at 369 ("If the proposed accommodation is 'plainly reasonable,' '[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable.'" (quoting *Noll*, 787 F.3d at 94)).  But in the interest of completeness, the Court will briefly address Plaintiff's arguments that Defendants should have provided her with additional or different accommodations upon her return from leave.

Plaintiff's objections to Defendants' accommodations largely pertain to her personal preferences, rather than any medical necessities.  For example, Plaintiff expressed ethical concerns with performing coach evaluations by video, rather than in person.  (Def. 56.1 ¶ 139).  But Defendants had the discretion to choose among effective accommodations and were not required to provide a perfect accommodation, or even the accommodation most strongly preferred by Plaintiff.  *See Berger*, 304 F. Supp. 3d at 369; *Welch* v. *United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 188 (E.D.N.Y. 2012) ("[A]n employer need not accept the employee's preferred accommodation, even if reasonable, if another accommodation had already been made."); *see also Nieblas-Love* v. *N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 73-74 (S.D.N.Y. 2016) (deeming plaintiff's desire to take breaks without alerting his supervisor "nothing more than a personal preference" and finding that "failure to accommodate that preference [did not] support a claim of discrimination").

Plaintiff's other issues with Defendants' accommodations were similarly not driven by medical necessity.  Plaintiff requested that she be made responsible for schools in the New York City area, where she could potentially support coaches in the field, rather than being assigned to support coaches in the Syracuse School District by video.  (Pl. Dep. 281:18-282:10).  But Plaintiff had herself requested restrictions on travel (Def. 56.1 ¶ 109), and thus her assigned responsibilities ensured that she would be able to work entirely remotely, while her colleagues with relationships to the New York City coaches continued with those responsibilities (*id.* at ¶¶ 138, 143, 172-73).  Because Plaintiff's request was again a matter of preference, it does not support her failure to accommodate claims.  *See Woldeselassie* v. *Am. Eagle Airlines/Am. Airlines*, No. 12 Civ. 7703 (LGS), 2015 WL 456679, at *9 (S.D.N.Y. Feb. 2, 2015) (finding no violation of the ADA and NYSHRL where plaintiff's transfer request was a matter of preference rather than medical necessity), *aff'd sub nom. Woldeselassie* v. *Am. Eagle Airlines, Inc.*, 647 F. App'x 21 (2d Cir. 2016) (summary order).

Plaintiff also requested that she instead receive a new support role, under which she could transcribe videos and help develop power point presentations for coaches.  (Def. 56.1 ¶ 144).  However, ANet already had a team of employees responsible for transcribing videos, and ANet coaches had developed their own PowerPoint presentations.  (*Id.* at ¶ 145).  Further, those tasks were not part of Plaintiff's responsibilities as Managing Director, and there were no available open support roles to which to transfer Plaintiff.  (*Id.* at

¶¶ 145, 147).  Plaintiff cannot satisfy her burden to identify a potential accommodation "merely by reciting the formula that her employer could have reassigned her." *McBride* v. *BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009).  "Instead, she must demonstrate the existence, at or around the time when accommodation was sought, of an existing vacant position to which she could have been reassigned." *Id.* at 97-98.  Plaintiff has not demonstrated that Defendants refused to assign her to any such existing vacant position.

*Lastly*, Plaintiff objected to Defendants' failures to adjust certain of her documented goals upon her return from leave in November 2017.  (Compl. ¶ 101).  On November 30, 2017, Plaintiff was provided with a re-entry plan outlining her responsibilities and goals in her new role as Executive Director of ANet's Mid-Atlantic Region, which plan included goals related to developing growth in the Upstate New York school districts.  (Def. 56.1 ¶ 182).  Plaintiff alleges that Martin indicated that these goals would not be adjusted to account for the five months of Plaintiff's medical leave.  (Compl. ¶ 101).  But Plaintiff does not explain what adjustments should have been made.  Additionally, Plaintiff herself acknowledged that she did not raise any further concerns about these goals in her subsequent weekly check-ins and discussions with Martin.  (Def. 56.1 ¶ 184; Pl. Dep. 360:20-361:15).  And Plaintiff further recognized that business development was the "linchpin" to continuing her position.  (Pl. Dep. 374:9-10).  Having failed to raise this issue at the time, Plaintiff may not now make it the basis of a failure to accommodate claim, particularly in light of the record of Defendants' willingness to provide

42

reasonable accommodations. *See Elmessaoudi* v. *Mark 2 Rest. LLC*, No. 14 Civ. 4560 (PGG), 2016 WL 4992582, at *8 (S.D.N.Y. Sept. 15, 2016) ("[A]ny such inadequacy in the accommodation granted to Plaintiff … is attributable to Plaintiff's failure 'to make reasonable efforts to help [the employer] determine what specific accommodations [were] necessary.'" (quoting *Shroeder* v. *Suffolk Cnty. Cmty. Coll.*, No. 07 Civ. 2060 (JFB) (WDW), 2009 WL 1748869, at *14 (E.D.N.Y. June 22, 2009))).

Plaintiff's failure to accommodate claim cannot survive even under the broader protections of the NYCHRL.  Under the NYCHRL, Plaintiff must show that she was treated "less well" than her colleagues "at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8.  Plaintiff has not made any such showing, and there is no evidence in the record that similarly-situated colleagues were provided accommodations that Plaintiff was denied. Moreover, while under the NYCHRL, all accommodations are presumed reasonable until proven otherwise, a defendant can overcome this presumption by showing the accommodation would be an undue burden or that the employee could not perform her duties even with the accommodation. *LeBlanc* v. *United Parcel Serv.*, No. 11 Civ. 6983 (KPF), 2014 WL 1407706, at *18 (S.D.N.Y. Apr. 11, 2014).  Plaintiff has herself acknowledged that the further accommodations she requested were not medically necessary, and that none of the requests was related to her medical condition.  (Def. 56.1 ¶ 146).  And as discussed above, Defendants have in turn demonstrated that Plaintiff's requested accommodations were not reasonable as there was no available role

43

that met her specifications.  As such, Defendants have overcome the NYCHRL's reasonable accommodation presumption.  *See Stryker* v. *HSBC Sec. (USA)*, No. 16 Civ. 9424 (JGK), 2020 WL 5127461, at *12 (S.D.N.Y. Aug. 31, 2020) (dismissing NYCHRL failure to accommodate claim where defendant demonstrated that it had offered a reasonable alternative accommodation and that plaintiff's proposed alternative was not reasonable); *Lazzari* v. *N.Y.C. Dep't of Parks & Recreation*, 751 F. App'x 100, 103-04 (2d Cir. 2018) (summary order) (finding that proposed accommodation was not reasonable under the NYCHRL where it impeded defendant's ability to maintain city facilities and placed a strain on other employees).

In sum, Defendants worked with Plaintiff to craft several accommodations that were plainly reasonable, and Plaintiff has failed to identify a facially reasonable accommodation that Defendants refused to provide.  Thus, Defendant's motion for summary judgment is granted as to Plaintiff's failure to accommodate claims.

### 3.    The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Discrimination Claims

Plaintiff alleges that following her diagnosis, she was subjected to several allegedly discriminatory actions by the Defendants, culminating in the eventual elimination of her position.  (Compl. ¶¶ 128-29, 143-45).  Defendants argue that Plaintiff has not established a *prima facie* case of discrimination, as she has not demonstrated that she suffered an adverse employment action because of her disability.  (Def. Br. 21-22).

As stated above, to establish a *prima facie* case of discrimination under the ADA or NYSHRL, a plaintiff must show that (i) her employer is subject to the statute; (ii) she is disabled within the meaning of the statute or perceived to be so by her employer; (ii) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (iv) she suffered an adverse employment action because of her disability. *See Jacques*, 386 F.3d at 198; s*ee also Nelson*, 2013 WL 4437224, at *6. Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate reason for the challenged employment decision. *Sista*, 455 F.3d at 169. Plaintiff must then carry the burden of persuasion that the proffered reason is a pretext. *Id.* Here, Defendants do not dispute that Plaintiff has established the first three prongs of a *prima facie* case of discrimination. However, they contend that Plaintiff has not met the fourth prong, that is, that she has not established that she suffered an adverse employment action *because of* her illness.

Plaintiff alleges that after ANet learned of her diagnosis, it hired and "groomed" Stephens to fill her role, phased out Plaintiff's job and ultimately eliminated her position. (Compl. ¶ 68). However, there is no evidence in the record supporting Plaintiff's assertion that Stephens was hired with any improper goal of replacing her. Rather, in the fall of 2016, when Plaintiff and Martin became responsible for the broader Mid-Atlantic Region, Martin told Plaintiff that they needed an additional team member to assist with their work.

(Def. 56.1 ¶ 48; *see also* Pl. Dep. 151:15-152:4).[16]  Though Stephens did not begin work with ANet until January 2017, she was hired prior to Plaintiff's diagnosis, which establishes fairly definitively that Defendants had no such discriminatory motive as alleged by Plaintiff.  (Def. 56.1 ¶ 277).[17]

The record is equally lacking in support for Plaintiff's claim that Defendants "groomed" Stephens to replace Plaintiff due to her disability. Rather, it appears that Stephens took on many of Plaintiff's responsibilities while she was out on leave and working remotely, including temporarily assuming Plaintiff's duties for ANet's New York City school-based partnerships. (Def. 56.1 ¶¶ 138, 172).  Further, the decision to promote Stephens and Plaintiff to Executive Directors of the New York-Metro and Upstate New York Regions, respectively, was not an adverse action, as Plaintiff continued her prior work with the Upstate New York Region, and the title change was in fact a promotion.  (*Id.* at ¶¶ 168-69).  *See Hoag* v. *Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 486 (S.D.N.Y. 2017) (finding that a teacher's transfer from a high school to an elementary school was not an adverse employment action because there was "no other evidence that her job responsibilities were diminished, that teaching at the elementary school was less prestigious than teaching at the [high school], that her transfer was tantamount to a demotion,

---

[16]    Plaintiff has also acknowledged that she was part of the hiring process and that she interviewed Stephens.  (Pl. Dep. 152:11-18).

[17]    Although the underlying record does not reflect Stephens's offer date, it does indicate that the hiring process for her role began in or around late August 2016, and was fully underway by September 2016.  (Mellk Decl., Ex. K at 21, 24).  Further, Stephens was selected as the new Managing Director in November 2016.  (*Id.* at 16; *see also* Def. 56.1 ¶ 277).

or that there was any other meaningful difference between her jobs at the two schools"). Plaintiff's subjective "dissatisfaction with the work assigned (or not assigned)," absent some evidence that the assignment or lack thereof materially worsened Plaintiff's working conditions, "is insufficient to make out an adverse employment action." *Johnson* v. *Morrison & Foerster LLP*, No. 14 Civ. 428 (JMF), 2015 WL 845723, at *5 (S.D.N.Y. Feb. 26, 2015); *see also Smith* v. *City of New York*, 385 F. Supp. 3d 323, 336 (S.D.N.Y. 2019) (finding that police cadet's objections to his reassignment from training to mail duty "amounted to nothing more than subjective dissatisfaction where plaintiff "offer[ed] no detail as to how mail duty resulted in tangibly worse working conditions").

Plaintiff alleges two additional adverse employment actions stemming from meetings with Martin during: (i) Plaintiff's June 2017 employment performance review (Compl. ¶ 82); and (ii) a December 2017 meeting to discuss Plaintiff's goals (*id.* at ¶ 101). With respect to the first alleged adverse employment action, Plaintiff does not ascribe any negative consequences to the June 2017 review. Her primary objection appears to be with the review's very occurrence. (*Id.* at ¶ 82). However, "negative evaluations, standing alone without any accompanying adverse results, are not cognizable" under the anti-discrimination laws." *Siddiqi* v. *N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008) (quoting *Bennet* v. *Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001)); *see also Farina* v. *Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) (summary order) (observing that negative employment evaluation letters "may be considered adverse employment

47

actions," but not without "proof that the evaluation had any effect on the terms and conditions of [plaintiff's] employment" (internal citations omitted)). Because Plaintiff proffers no evidence that the review led to a "demotion, diminution of wages, or other tangible loss[,]" this alleged conduct does not qualify as an adverse employment action.  *See Siddiqi*, 572 F. Supp. 2d at 367. As to the December 2017 meeting, Plaintiff alleges that Martin refused to adjust her annual goals to account for Plaintiff's leaves of absence that year. (Compl. ¶ 101).  However, as discussed in connection with Plaintiff's failure to accommodation claims, Plaintiff offers no explanation as to why her goals required adjustments going forward, or why failing to make such adjustments was an adverse employment action.[18]  And, fatally, she also has not demonstrated that the failure to adjust her goals had any negative consequences.

Separately, Plaintiff alleges that Martin demonstrated various lapses in empathy, including requesting that Plaintiff walk her though a presentation within hours of Plaintiff's diagnosis, telling Plaintiff her intermittent leave was disruptive, asking Plaintiff to complete a self-evaluation after Plaintiff shared that she was suffering from a fingernail infection and could only communicate by phone, and displaying aggressive body language.  (Compl. ¶¶ 31, 42, 80, 99).  These allegations, even construed in the light most favorable to Plaintiff, are at most "speculation and conjecture," with little offered to link them to any

---

[18]    The Court further observes that Martin had demonstrated willingness to adjust Plaintiff's goals while she was on intermittent leave, as evidenced by the Expectation Adjustments that modified her end-of-year goals.  (Def. 56.1 ¶¶ 132-34).

discriminatory intent.  *Nieblas-Love*, 165 F. Supp. 3d at 68 ("[A]llegations []
founded on nothing more than Plaintiff's self-serving *ipse dixit*, are …
insufficient to defeat a motion for summary judgment.").

In short, Plaintiff has failed to establish that she suffered any adverse
employment actions within the meaning of the ADA or the NYSHRL prior to the
elimination of her role.  And even if Defendants' conduct qualified as adverse
employment actions, Plaintiff has not shown that such actions were taken
"*because of* her disability" — that is, "under circumstances giving rise to an
inference of discrimination."  *Davis*, 804 F.3d at 235 (emphasis added and
internal quotation marks omitted).

The only potentially adverse employment action Plaintiff has alleged is
her termination from ANet.  *See E.E.O.C.* v. *Bloomberg L.P.*, 967 F. Supp. 2d
816, 843 (S.D.N.Y. 2013) (identifying termination of employment as an adverse
employment action within the ADA).  However, the Court will address whether
Defendants have met their burden of establishing legitimate, non-pretextual
reasons for Plaintiff's termination when it considers Plaintiff's retaliation
claims.  (*See* Def. Br. 22-25).  The Court otherwise finds that Plaintiff has failed
to offer evidence sufficient to establish a *prima facie* case of discrimination
under the ADA and the NYSHRL.  As such, Defendants are granted summary
judgment as to these claims.

With respect to the NYCHRL, a plaintiff is not required to show an
adverse employment action and need only "show differential treatment — that
she was treated 'less well' — because of a discriminatory intent."  *Mihalik*, 715

49

F.3d at 110.  But a plaintiff must still offer evidence that the complained-of
conduct was "caused by a discriminatory motive."  *Id.*  Even under this lenient
standard, Plaintiff has not demonstrated that discriminatory intent played any
role in Defendants' employment actions, let alone that similarly-situated
employees received more favorable treatment.  As a result, summary judgment
must be granted as to her NYCHRL claim as well.[19]

### 4. The Court Grants Summary Judgment in Favor of Defendants as to Plaintiff's Retaliation Claims

Plaintiff alleges that Defendants retaliated against her for engaging in the
following protected activities: (i) exercising her rights under the FMLA; (ii) filing
a Charge of Discrimination with the EEOC; and (iii) reporting Martin's unlawful
employment practices.  (Compl. ¶¶ 86, 90, 107, 109-10, 120, 132).  The
conduct alleged by Plaintiff to be retaliatory overlaps to a significant degree
with the conduct challenged in Plaintiff's failure to accommodate and
discrimination claims, which conduct the Court has discussed above.
Defendants counter that they were not aware of Plaintiff's Charge of
Discrimination at the time the decision was made to eliminate Plaintiff's role,
and thus they could not have made the decision based on any retaliatory
motive.  (Def. Br. 24-25).  Further, they argue that to the extent Plaintiff alleges

---

[19]     Plaintiff's aiding and abetting claims under the NYSHRL and the NYCHRL are in turn
dismissed as well.  *See Tulino* v. *City of New York*, No. 15 Civ. 7106 (JMF), 2016 WL
2967847, at *5 (S.D.N.Y. May 19, 2016) (observing that where a plaintiff's NYSHRL
discrimination and hostile work environment claims were dismissed "it [was] unclear
what unlawful conduct the [defendants] could have aided and abetted").

that Defendants retaliated against her for engaging in other protected activities, such conduct had a legitimate, non-pretextual basis.  (*Id.* at 25).

As stated above, to establish a *prima facie* case for retaliation under the ADA and the NYSHRL, a plaintiff must show that "[i] she engaged in protected activity, [ii] the employer was aware of this activity, [iii] she was subjected to an adverse employment action against her, and [iv] a causal connection existed between the alleged adverse employment action and her protected activity." *McGuire-Welch*, 720 F. App'x at 62 (citing *Weixel*, 287 F.3d at 148).  Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision.  *See Treglia*, 313 F.3d at 721.  If the defendant proffers such evidence, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  *Cifra*, 252 F.3d at 216.

The Court first considers the extent of Plaintiff's proffered protected activities.  First, Plaintiff claims that she was retaliated against for exercising her rights under the FMLA.  (Compl. ¶ 107).  As discussed above, Defendants determined that Plaintiff was ineligible for FMLA leave, and she has not otherwise demonstrated any entitlement to such leave; she cannot therefore have engaged in a protected activity on this basis.  (Def. 56.1 ¶¶ 18, 236-38).  Plaintiff next alleges that she made several internal complaints about Martin's conduct, including: (i) complaining generally to the Human Resources Manager about Martin and "culture"-related challenges on the team; (ii) complaining to

ANet's Managing Director of Talent Development in June 2017 that she did not feel supported by Martin; and (iii) complaining to Cockrell that Martin's body language at a work retreat in November 2017 was "aggressive." (*Id.* at ¶ 297). For such internal complaints to constitute protected activity, Plaintiff must show that she had "a good faith, reasonable belief that [she has] made a complaint opposing an employment practice made unlawful ... by the ADA." *Salas* v. *N.Y.C. Dep't of Investigation*, 298 F. Supp. 3d 676, 685 (S.D.N.Y. 2018) (citation and internal quotation marks omitted). Plaintiff acknowledges that when making her complaints, she did not express that she felt she was being discriminated against, as she did not know the "why" behind Martin's actions, and she did not otherwise characterize Martin's conduct as unlawful. (Def. 56.1 ¶¶ 302-03). As such, though Plaintiff may have had a genuine concern about Martin's behavior towards her, her generalized complaints do not constitute protected activity within the ADA or the NYSHRL. *See Woldeselassie*, 2015 WL 456679, at *8 ("[I]t is well established that a complaint of generalized harassment unrelated to disability does not constitute protected conduct under the discrimination statutes.").

The Court next addresses Plaintiff's filing of a Charge of Discrimination with the EEOC, which was protected activity. This is undisputed by Defendants, who instead argue that ANet lacked knowledge of the Charge until after it made the decision to eliminate Plaintiff's role. (Def. Br. 24; Def. 56.1 ¶¶ 294-95). Specifically, Defendants submit that while Plaintiff filed her charge with the EEOC in December 2017, the EEOC did not transmit a copy of the

Notice of Charge of Discrimination to ANet until April 23, 2018, and, further, that ANet did not learn of the Charge until May 1, 2018.  (Def. 56.1 ¶ 226; *see also* Cockrell Decl. ¶ 41).  Plaintiff was informed that her position had been eliminated at some point between April 23, 2018 and May 1, 2018.  (Def. 56.1 ¶ 207).  From these facts, Defendants argue that at the time Cockrell decided to eliminate Plaintiff's role, ANet was unaware of Plaintiff's Charge of Discrimination.  (*Id.* at ¶ 228; *see also* Cockrell Decl. ¶ 41).

Plaintiff has put forth limited evidence indicating that Defendants were aware of her filing with the EEOC.  In her deposition, she testified that she had told two employees at ANet about her filing with the EEOC, though neither employee was her supervisor.  (Pl. Dep. 498:7-25).  She could not recall if she had otherwise spoken with anyone at ANet regarding her intention to file.  (*Id.* at 498:2-6).  The Second Circuit has observed that "[n]either this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon* v. *N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000); *see also Zann Kwan*, 737 F.3d at 844 (holding that complaint to corporation's officer sufficed to impute "general corporate knowledge of plaintiff's protected activity" to corporation); *Patane* v. *Clark*, 508 F.3d 106, 115 (2d Cir. 2007) (finding that defendant university's knowledge of protected activity could be inferred from complaint to university employee responsible for investigating and resolving such complaints).  Here, Plaintiff has not alleged or put forth evidence that she made complaints of discrimination, or otherwise

53

reported her EEOC filing to an ANet officer or employee responsible for investigating and resolving such complaints.

But even were the Court to find that Plaintiff had met her *prima facie* burden,[20] Defendants have proffered a legitimate, non-retaliatory basis for the termination of Plaintiff's role.[21]  Plaintiff's position was eliminated in connection with an organization-wide restructuring prompted by the Syracuse School District's budget deficit in 2018.  (Def. 56.1 ¶¶ 189, 192, 195-207). Because of the impact of this budget deficit on ANet's partnerships in its Upstate New York Region, Plaintiff was informed that, in order to maintain her role, she would be required to increase sales and growth cultivation efforts.  (*Id.* at ¶ 198).  Moreover, rather than seeking to terminate Plaintiff, Cockrell asked Plaintiff if she was willing to take on changes to her role, or if there was a different position within ANet she wanted to explore.  (*Id.* at ¶¶ 199-201). However, Plaintiff indicated she would need a "blueprint" to follow were she to

---

[20]    In addition to the Court's other enumerated concerns with Plaintiff's *prima facie* case, the Court observes that Plaintiff may not have demonstrated the the requisite "causal connection" between her protected activity (her EEOC filing) and Defendants' adverse employment action (her termination).  *See Treglia* v. *Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  Absent any evidence to support an inference that the decisionmakers knew of her filing — and Plaintiff has put forth none — Plaintiff cannot rely on circumstantial evidence of knowledge as evidence of causation.  *See Murray* v. *Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 271 (S.D.N.Y. 2007).  While Plaintiff can point to the temporal proximity of her EEOC filing and the termination of her position, "the lack of knowledge on the part of particular *individual* [Defendants or their agents] is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity[.]"  *Gordon* v. *N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  That being said, for the purposes of assessing Defendants' proffered reasons for their conduct, the Court will assume here that Plaintiff has established the requisite causal connection for a *prima facie* case of retaliation.

[21]    With the exception of Plaintiff's termination, the other adverse employment actions alleged in the Complaint have been addressed and found insufficient in the course of the Court's analysis of Plaintiff's failure to accommodate and discrimination claims.

maintain her position, which Cockrell found troubling given Plaintiff's experience with the region. (*Id.* at ¶ 203). Plaintiff also did not pursue any other positions with ANet, despite being invited to do so by both Cockrell and others. (*Id.* at ¶¶ 206-13, 216-19). Notably, once ANet did receive notice of Plaintiff's EEOC filing, rather than seeking to terminate Plaintiff, ANet employees continued to encourage her to apply for other positions. (*Id.* at ¶¶ 209-13, 218-19). Given this evidence, Defendants have put forth legitimate, nondiscriminatory reasons for Plaintiff's termination. *See Ben-Levy* v. *Bloomberg L.P.*, No. 11 Civ. 1554 (KBF), 2012 WL 2477685, at *8 (S.D.N.Y. June 26, 2012) (accepting employer's proffered reasons for employment decisions, which included corporate reorganization and plaintiff's performance), *aff'd*, 518 F. App'x 17 (2d Cir. 2013) (summary order). And Plaintiff has demonstrated no basis for pretext.

Turning to the NYCHRL, to prevail on a retaliation claim, a plaintiff must show that "she took an action opposing her employer's discrimination ... and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted). Even under this "less demanding standard," a "plaintiff still must establish that there was a causal connection between [her] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [her] termination was pretextual or motivated at least in part by an impermissible motive." *Hughes* v. *Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 449 (S.D.N.Y. 2018) (citation and internal

quotation marks omitted).  Plaintiff's NYCHRL retaliation claim suffers from the same defects as her federal and state claims — because Defendants did not have notice of her EEOC Charge at the time they decided to eliminate her position, Plaintiff has not met her burden of demonstrating that retaliation was a motivating factor in that decision.  *Stryker*, 2020 WL 5127461, at *14.

Even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not conclude either that Plaintiff has established a *prima facie* case of retaliation, or that Plaintiff has shown that Defendants' legitimate reasons for their employment decisions were pretextual.  Thus, Defendants are entitled to summary judgment as to Plaintiff's retaliation claims.

## CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      March 2, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge